## KEYSTONE ENGINEERING CORPORATION *v.* SUTTER

[No. 59, October Term, 1950.]

*Decided January 10, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*William Dunbar Gould* and *Irving B. Grandberg* for the appellant.

*William B. Somerville* and *Roszel C. Thomsen,* with whom were *Clark, Thomsen & Smith* and *S. Scott Beck, Jr.* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

The appellee, Sutter, was the general contractor engaged in the erection of a high school at Prince Frederick, Maryland. He had two subcontracts with the appellant Keystone Engineering Corporation to furnish electric wiring, etc., in the high school in accordance with the plans and specifications prepared by the architect, for the total sum of $26,590. The work and materials had

to meet the requirements of the specifications, and the subcontractor agreed to be bound to the general contractor by all terms and conditions by which the general contractor was bound to the owner. One of the provisions in the contract of the general contractor with the owner was that if the contractor should persistently or repeatedly refuse or should fail to supply enough properly skilled workmen or proper materials, or should otherwise be guilty of a substantial violation of any provision of the contract, the owner, upon the certificate of the architect that sufficient cause existed to justify such action, might without prejudice to any other right or remedy, and after giving the contractor seven days written notice, terminate the employment of the contractor, take possession of all the materials, tools and appliances, and finish the work by whatever method he might deem expedient. In such case, the contractor would not be entitled to receive any further payment until the work was finished, and then, if the expense of finishing the work should exceed any unpaid balance, the contractor should pay the difference to the owner. There was nothing in Sutter's contract with the owner, and nothing in Keystone's contract with Sutter with respect to the employment of union labor. Sutter employed some union and some non-union men, and Keystone employed only union men. Keystone's first contract was made on July 28, 1947, in the form of a purchase order, and there was another similar contract on April 29, 1948 for some additional work. Keystone started with the work and had apparently finished about 51% of it in July, 1948. The electrical work had to be done ahead of that of the bricklayers, but the job progressed without special difficulty until July 6, 1948. Shortly before that date, a union organizer from Washington wanted to organize the laborers on the job. On July 6, the laborers did not show up, and on July 7, two or three pickets appeared. The Keystone men worked the first day they were there, but thereafter did not come to work. The bricklayers caught up with the electricians, and when Sutter's superintendent

called Keystone's foreman to get some workmen on the job, he was told that they would not go through the picket line. This condition continued until Keystone wrote Sutter a letter on July 27, in which it stated: "Please be advised that, due to conditions beyond our control, we are unable to proceed with our work due to your action in employing non-union mechanics." Sutter replied to this letter on July 29, calling attention to the fact that there was no agreement between the parties as to the type of workmen employed, and requesting Keystone to proceed at once with the installation of the work. On the same day, Sutter engaged the Taylor Electric Company to proceed with the electrical work. Sutter and Taylor both say that this was a temporary arrangement in order to keep ahead of the bricklayers. Keystone's superintendent said that he was present at the time, and Sutter's men made a verbal agreement with Taylor to complete the job. On July 30, Keystone wrote Sutter stating: "Due to labor trouble on the subject job you are placing obstacles in our path so that we are handicapped in our attempts to proceed with our work. We are ready, willing and able to prosecute our work, and have the necessary material, manpower and tools to do so, but cannot proceed until you remove the obstacles from our path." It was testified by Keystone's witnesses that the obstacles were the pickets. The day before this letter, and the same day on which Keystone's foreman claims the permanent arrangement was made with Taylor, the architect wrote Sutter complaining of the lack of progress on the building and stated: "I understand your electrical contractor is not on the job. May I suggest that if they refuse to return within a reasonable time, that you terminate your contract with Keystone and finish the job with another contractor." On August 2, Sutter gave Keystone written notice, stated to be in accordance with the provisions of the general contract which we have quoted above, that unless Keystone had men at work by August 9, its contract would be terminated and all payments would be handled in strict ac-

cordance with the general contract. This seven-day notice had no effect, and thereafter Taylor went ahead with the contract and completed the electrical work. The cost of such completion was in excess of the amount owing Keystone. Keystone sued Sutter in the Circuit Court for Kent County for breach of contract, claiming $33,677.22 damages. Sutter filed pleas and a counter-claim for $1,000 for the excess of the cost of completion over the contract price. Testimony was heard before a jury, and, at the conclusion of the testimony, Sutter moved for a directed verdict and the court granted this motion. The counter-claim was withdrawn in open court by the defendant after leave was granted. The verdict and the withdrawal of the counter-claim were on April 27, 1950.

On May 18, 1950, an order for appeal was filed without any further action in the case. It is therefore apparent that we have here an appeal in an action at law before final judgment. Such an appeal cannot be maintained, and, had no further action been taken, we would have to dismiss this case. *Boteler & Belt v. State,* 7 Gill & J. 109, 113. *Kendall Lumber Co. v. State,* 132 Md. 93, 100, 103 A. 141. In the last mentioned case, however, while the order for appeal was entered on May 31, 1917, and the final judgment on June 6, 1917, counsel had treated the appeal of May 31 as a valid one, and had agreed that two other cases involving the same question should be bound by the decision in that case. Under these circumstances, the court said that to dismiss the appeal would work a great hardship and would amount to a practical denial of justice. In the case before us, there is no motion to dismiss the appeal. On the contrary, after argument, when counsel became aware of the lack of a judgment, application was made to the Judge of the Circuit Court for Kent County who heard the case, and, on December 21, 1950, a judgment was entered in favor of the defendant against the plaintiff for costs, *nunc pro tunc,* May 2, 1950, and an agreement of counsel is filed in the case to the effect that the docket entries showing the record of this judgment be included in the transcript

sent to this court. As the case was fully argued, and all parties desire its decision on the merits, and as the effect of dismissing the case would only result in the appellant having to file a new appeal, with the consequent additional expense and delay, or, because of such expense, being denied an appeal, we think it is in the interest of justice to treat the appeal before us as one from the judgment entered *nunc pro tunc*, and we will so consider it. In so doing, however, we are not in any way relaxing the rule that there must be a final determination in the court below, before an appeal can be brought here.

The appellant contends that the appellee breached the contract on July 29, by employing Taylor to complete the electrical work, that the notice given on August 2 was too late because the contract had previously been breached by Sutter, and that, in any event, the notice was not sufficient because the letter from the architect was not a certificate in accordance with the general contract.

The question whether or not Sutter breached the contract is based upon the testimony of Keystone's superintendent, Doughty, and, while this is contradicted, appellant says that it is sufficient to take the case to the jury. Doughty testified that it was true that, after some previous difficulties due to what he called a strike of the non-union laborers, Keystone stopped working altogether on July 7. He said that this was on account of the picket line, and if the picket line had not been there, he was in a position to take his employees immediately on the job. He went to the high school on July 29, and he said that at that time, while he was there, Sutter made a verbal agreement with the Taylor Electric Company to go ahead with the work on a time and material basis. He said this was a joint agreement with the Taylor Company to complete the whole job, and that he protested on the ground that he had material on the job and he thought he should have a material settlement as to this.

If we assume this is true, as we must, in considering whether a verdict should have been instructed against Keystone, we have to bear in mind also that Keystone ceased to work after July 7, and, on July 27, stated it could not work so long as the non-union labor was employed. There was no justification for the refusal of Keystone to work on this ground, and Sutter was entirely justified in getting someone else to continue the unfinished electrical work which was holding up the entire construction. Even if he did make an arrangement with Taylor to complete the electrical work, as stated by Doughty, this would not necessarily breach Keystone's contract, if the latter had come back and had been willing to go on with the work. The letter from Sutter written on July 29 requests Keystone to proceed with the installation of its work, and the reply, on July 30, which was after Mr. Doughty had visited the job and reported to Keystone, clearly indicated that the latter did not regard the contract as ended, because it stated that Keystone was ready, willing and able to prosecute its work, but could not proceed until the labor difficulties were removed. Under these circumstances, we cannot find that the testimony of Mr. Doughty showed a breach of the contract on the part of Sutter as of July 29. On the contrary, the uncontradicted testimony of all the witnesses, including himself, indicates an earlier breach of the contract by Keystone.

When a contractor on a building contract fails to perform, one of the remedies of the owner is to complete the contract, and charge the cost against the wrongdoer. Williston on Contracts, Rev. Ed. Vol. 5, § 1363, p. 3825, Restatement Contracts, ch. 12, § 346, Subsec. (1) (a) (i), p. 573 and Comment 1, p. 576. This is a right which was not limited by the general contract which, in its designation of the method by which the contract might be terminated, states that this is "without prejudice to any other right or remedy." However, without elaborating this point, it seems clear to us that Sutter did follow very definitely the procedure outlined in the contract. The

general contract says that seven days written notice must be given upon the certificate of the architect if sufficient cause exists to justify such action. The letter from the architect of July 29, after stating that he understands the electrical contractor is not on the job, suggests that upon a refusal to return within a reasonable time, the contract be terminated. The contract provision does not prescribe any particular form of certificate, but the wording of the architect's letter conforms to the requirement of the contract, and we think it quite sufficient to justify the notice given to Keystone. Since, therefore, the evidence shows that the contract was breached by Keystone, and was not breached by Sutter, that Sutter then, under the necessities of the situation, got another electrical contractor to complete the work, although still insisting that Keystone complete it, that Sutter gave Keystone notice of termination under the terms of the contract, and that Keystone still refused to return and complete its work, and Sutter thereupon had the work completed by Taylor, we conclude that the contract was properly terminated. Sutter was therefore entitled to charge the cost of completion of the work against Keystone, and as this exceeded the amount owing Keystone, the trial court was correct in directing a verdict for Sutter, and the consequent judgment will be affirmed.

*Judgment affirmed with costs.*