FOSTER-PORTER ENTERPRISES, INC., ET AL *v.*
DE MARE
(Two Appeals in One Record)
[No. 146, October Term, 1950.]

*Decided May 23, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*George Cochran Doub,* with whom were *Marshall, Carey, Doub and Mundy,* and *Frank L. Fuller, III,* on the brief, for defendants, appellants and cross-appellees.

*Marshall A. Levin,* with whom were *Harry O. Levin* and *Jacob J. Edelman* on the brief, for plaintiff, appellee and cross-appellant.

MARKELL, J., delivered the opinion of the Court.

These are cross-appeals from a decree (1) dissolving a restraining order and (2) declaring that an agreement dated March 13, 1950, between plaintiff and defendant, Foster-Porter Enterprises, Inc., is still in full force and effect and is the only agreement or contract between them. Defendants appeal from the declaration that the March 13, 1950, agreement is still in full force and effect; plaintiff appeals from dissolution of the restraining order.

Plaintiff filed a bill against Foster-Porter, Thomas R. Foster, Edward J. Foster and Richard T. Porter, officers and directors of Foster-Porter, alleging that by written agreement dated March 13, 1950, he was constituted by Foster-Porter the exclusive distributor of mechanical devices for the pitching of baseballs, known as "Foster

Pitching Arms", in New Jersey and Florida, and at the time of the execution of the agreement it was verbally understood that by supplemental agreement he would be constituted a national distributor "in all and any place or places throughout the United States where he desired to set up an agency, provided that he purchased and paid for at least five machines at a price which would give them a fair return", that defendants had failed and refused to exercise the supplemental agreement and that by written notice dated July 11, 1950, Foster-Porter had advised plaintiff that the agreement of March 13, 1950, was cancelled by reason of his breaches of it. The bill prayed injunction against cancelling the agreement of March 13, 1950, execution and specific performance of a supplemental agreement constituting plaintiff national distributor of defendants' products, injunction from entering into any agreement with any person or persons for the purpose of selling or distributing "Pitching Arms" in contravention of defendants' agreements with plaintiff, and accounting.

On August 14, 1950, the day the bill was filed, without notice to defendants, an order was signed "that a writ of injunction be issued as prayed in said bill" upon the filing of a bond in the penalty of $2,000. In view of ambiguity in the prayers of the bill as referred to in the order and apparent contradiction between the order and the injunction issued by the clerk, the scope of the order and the injunction is not clear. As neither party has made any point of this, we need not consider it. Nor has any question been raised as to the scope of the two appeals. They seem to be regarded by both parties as appeals from so much of the decree as is contrary to or falls short of the contentions of the respective parties. We shall so regard the appeals.

On September 5, 1950, defendants filed an answer (including a demurrer) to the bill and a motion to dissolve the restraining order of August 14, 1950. On September 25, 1950, the case was heard, before Judge Moser, on the merits as well as on the motion to dissolve.

On September 20, 1950, plaintiff had filed an amended bill, making additional parties, Automatic Baseball Equipment Corporation, incorporated in August, 1950, to take over Foster-Porter, as licensee and distributor, Mitchell-Hoffman and Company, Baltimore investment bankers, who on June 17, 1950, had contracted to make a public offering of 600,000 shares of stock of Automatic in connection with reorganization and expansion of Foster-Porter, and Telecoin Corporation of New York, a national distributor of Foster-Porter under an agreement dated August 1, 1950. Telecoin was not served with process. The other defendants answered and all except Mitchell-Hoffman have appealed.

At the hearing extensive testimony was taken, much of it relating to conversations between the parties prior to or at the time of the execution of the contract of March 13, 1950. Because the bill charged fraud, the court admitted much testimony subject to exception. After the close of the testimony, the court, finding no fraud, on motion struck out the testimony admitted subject to exception. On October 11, 1950, Judge Moser entered the decree from which these appeals are taken and filed the following memorandum opinion: "The court finds there was no fraud in connection with the written contract of March 13, 1950, and, therefore, conversations between the parties prior to or at the time of the execution of said contract are not admissible and should be stricken from the record. Were this not so, however, the court would further find that such conversations did not amount to any contract or agreement, but merely a hope or expectation of an indefinite something that might eventually materialize. The court further finds that the written agreement of March 13, 1950, was not properly terminated by the Foster-Porter Enterprises, Inc., in accordance with the terms thereof, or for any good, sufficient or valid reason; and further, that such contract is not terminable at will and is still in full force and effect. A decree when presented will be signed in accordance with above."

Plaintiff and defendants, in pleadings and testimony and, through counsel, in briefs and arguments, flatly— and uninhibitedly—contradict each other as to facts and make charges and counter-charges of fraud and bad faith. On disputed questions of fact we are not convinced that the judge, who saw and heard the witnesses, was wrong.

Foster-Porter, incorporated in 1948, is (or was) engaged in the manufacture and sale of Foster Pitching Arms, a mechanical device, invented or at least designed by the two Fosters, which throws overhand balls in much the same way as a human pitcher. The arm was originally designed for use by professional baseball clubs in batting practice, though the Fosters say it was designed primarily for outdoor amusement purposes. They say that before March 13, 1950 it had been purchased by the Brooklyn Dodgers, New York Yankees, Boston Braves, Washington Senators, numerous clubs on the West Coast, San Diego, San Francisco, and about eighty percent of the "big league clubs" are using them, that they set up "an experimental public batting range" in Baltimore in the summer of 1948, and in August, 1949 advertised it in a magazine, as guaranteeing "big profits for any amusement parks, concessions, fields, and other places of outdoor entertainment." The fact is, however, that prior to March 13, 1950, the arm was not used in any commercial public batting range or other amusement park.

Plaintiff says he saw the arm in use by the Brooklyn Dodgers, and decided "it would be a terrific idea for a baseball batting range". He ascertained that defendants were the manufacturers, and in February and March, 1950 met the Fosters first in Baltimore and twice in Brooklyn. At the second Brooklyn meeting on March 13, 1950 the contract of that date, which had been first drafted by defendants' counsel, and later revised, rewritten and further revised, was executed. Plaintiff had told the Fosters that their machine, which was hand-fed, could not be used on a batting range, because

without an automatic feed labor costs would be "terrific". The Fosters undertook to add an automatic feed.

By the agreement of March 13, 1950, between Foster-Porter, "Seller", and plaintiff, "Distributor", "The Seller agrees to sell and the Distributor agrees to purchase Foster-Porter Pitching Arms on the following terms and conditions; 1. Distributor shall be the Seller's exclusive representative to sell, lease or otherwise dispose of * * * Arms * * * to concessions, amusement parks and any others who charge a fee for the use of the * * * Arm. The Distributor is not authorized to sell the * * * Arm for use by baseball teams, whether professional or amateur, or for use by any party who charges admission fees to baseball games or to individuals for private use. Distributor will not represent, handle or use any type of machine similar to the * * * Arm. 2. The Distributor shall be limited to the following territory: New Jersey and Florida. Any sale in this territory by any party other than the Distributor shall be treated in all respects as if sold by Distributor. * * *." 3. The price to Distributor will be $975 f.o.b. Baltimore, including the automatic feed. Distributor will be allowed a discount of ten per cent for orders of not less than five, and an additional ten per cent in any thirty day period in which twenty or more are purchased or in any year period in which fifty or more are purchased. "Seller agrees that prices and discounts will be the same to all distributors who sell to the same class of buyers as are covered by this contract. Both parties agree * * * at the request of the other to renegotiate in good faith" to determine whether changes should be made in prices to compensate for a substantial increase or decrease in manufacturing costs, due to changes in costs of raw materials or to increase in volume. 4. Distributor hereby orders five machines, one-third of purchase price having been paid herewith. "Distributor is not obligated to purchase additional machines for a period of six months subsequent to the date of this agreement upon the understanding

that the Distributor will construct a single baseball batting range as promptly as the construction work can be completed, which work is to begin as soon as five machines are delivered. ~~After the end of the six months'~~ ~~period the Distributor is obligated to purchase~~ ~~machines in any twelve months' period."~~ 5. Seller agrees to ship machines with reasonable promptness, on terms stated herein, and will hold itself in a position to step up production to fill all orders received upon reasonable notice. 6. Seller warrants the machine to be well made of good material and free from basic defects which cannot be corrected within a reasonable time, and shall furnish new parts free should a defect in part or parts develop in one year after arrival at destination. 7. Seller shall not be responsible for delay from fires, strikes or other cause unavoidable or beyond Seller's control. "8. The Distributor shall act as independent contractor and not as agent of the Seller. 9. Patents are pending which, in the opinion of patent counsel, will result in full coverage to the Foster-Porter Pitching Arm." Seller will defend any suits against Distributor or any purchaser from him for patent infringement and will pay any damages awarded. "10. The following shall be deemed to be events of default hereunder: (a) If either party shall breach any obligation contained in this agreement, and such default shall continue for a period of ten days after written notice from the party not in default specifying the nature of the breach; (b) If the Distributor is unable to continue in this business on an active basis, bearing in mind its seasonal character; (c) ~~If Distributor does not sell —— ma-~~ ~~chines, or more, during each twelve months' period after~~ ~~the expiration of a six months' experimental period, dated~~ ~~from the first of the month after the execution hereof,~~ ~~and~~ (d) If proceedings of any kind in bankruptcy or insolvency or receivership, State or Federal, shall be brought against either the Distributor or the Seller, and such proceedings are not vacated within thirty days after institution; then and upon the happening

of any one of said events of default the party not in default shall have the right to terminate this agreement by written notice to the other. 11. This agreement is entered into on a personal basis with the Distributor and it may not be assigned and Distributor's estate will not acquire any rights hereunder."

At the time of March 13, 1950 agreement defendants were not in a strong financial condition. They had no factory, but sub-leased a portion of a machine shop, where they made their machines. Plaintiff was not then financially able to establish a distributorship for the entire United States, but hoped to develop into such a position. He says defendants had said they wanted five machines to a state—presumably a "show room", i.e., a batting range—for a distributorship, and a total order of one hundred machines for the whole national distributorship. He wanted an option, a first refusal, to handle whatever states he could possibly handle.

Testimony printed, of plaintiff, the Fosters and others, covers conversations before execution of the March 13, 1950 contract and conversations, correspondence, transactions and acts throughout, and after, the period from March 13, 1950 to July 11, 1950, when Foster-Porter wrote plaintiff, "Our counsel advises that your activities as distributor, of which we have conclusive evidence, amount to a serious and flagrant breach of your agreement with us. Accordingly we advise immediate cancellation." This testimony relates to both of the basic questions of fact, (1) whether there was any oral agreement to give plaintiff an option, or first refusal, of a national distributorship or additional state distributorships and (2) whether plaintiff was guilty of any breach of contract which entitled Foster-Porter to terminate the contract. On both questions the testimony is contradictory. Opposing witnesses assert and deny an oral agreement to give a distributorship option and to sign and send to plaintiff a form of "option letter" which plaintiff drafted and handed to the Fosters on May 11, 1950. As to breach of contract by plaintiff, the prin-

cipal question is whether plaintiff broke the contract by failing or refusing to sell machines or take orders or was unable to sell or take orders because the Fosters were unable to deliver. Of plaintiff's initial order for five machines one was delivered on April 30th, the other four on May 11th. A second order for five on May 24th was delivered on June 26th. In May and June extended negotiations between plaintiff and his father and the Fosters, with a view to improved operating facilities and organization, included meetings at Boonton, Newburgh, (New York), and Baltimore, and culminated in refusal by the Fosters, at the Baltimore meeting on June 7th, of an offer by plaintiff's father of $50,000 for a half-interest in Foster-Porter, coupled, the Fosters say, with a national distributorship for plaintiff. The subject of a New York or national distributorship was continued in letters from plaintiff to the Fosters on June 20th and June 24th, complaining of delays and defective parts and also asking for the "letter of option", a telephone conversation on Sunday, June 25th, between Boonton and Baltimore, regarding a proposed one hundred machine contract and distributorship, and a lengthy letter to plaintiff from the Fosters' counsel as to distributorship (without mentioning delays or defective parts), containing a statement, "No agreements have been entered into with you except the distributorship agreement dated March 13, 1950, covering New Jersey and Florida." To discuss the testimony or mention it with any particularity, would prolong this opinion to intolerable length. On the question of an oral agreement plaintiff has the burden of proof, on the question of breach of contract the defendants. On both questions Judge Moser's decision was against the party who had the burden of proof. After careful consideration of the testimony and other evidence we are not convinced that Judge Moser was wrong on either question or that on either question the burden of proof has been sustained.

With respect to plaintiff's claim of an oral agreement to give him an option on a national distributorship or

additional state distributorships, we agree with Judge Moser that Foster-Porter did not procure the March 13, 1950 contract by fraud, and therefore parol evidence of prior or contemporaneous conversations was inadmissible; and also that "such conversations did not amount to any contract or agreement, but merely a hope or expectation of an indefinite something that might eventually materialize". We may add that we are of the same opinion as to the effect of conversations subsequent to March 13th, which perhaps cannot be barred by the parol evidence rule.

Plaintiff's testimony at most indicates no oral option agreement but only oral promises to make a written option agreement. In reaching these conclusions we do not imply, and we think Judge Moser did not imply, that plaintiff's claim was made without plausible ground for belief on his part that the Fosters had agreed to realize, or would realize, his hopes in a legal contract. On the one hand, plaintiff's draft of option letter was too indefinite to be either businesslike, or legally binding. On the other hand, testimony for defendants shows that from the beginning and as late as June 25th the Fosters were eager to deal with plaintiff whenever and wherever they could do so on terms they regarded as advantageous to themselves.

The March 13, 1950 contract, defendants contend, is not legally enforceable, particularly not in equity by injunction or negative specific performance, for two distinct but related reasons, *viz.*, that it was terminable at will (1) for lack of mutuality and (2) in the absence of any definite term in the contract. Both contentions rest on elementary principles of the law of contracts, especially by analogy to contracts of employment; both questions, usually and in the instant case, depend upon the terms of the contract.

The word "distributorship" may mean much or little or nothing at all. Like one's relations with his lawyer or physician, or his butcher or baker or candlestick maker, which may continue for life, but are legally bind-

ing only at will, the word or the relation may signify only one transaction or proposed transaction plus an expectation of similar transactions in the future. *Park Beverage Company v. Goebel Brewing Company,* 197 Md. 369, 79 A. 2d 157; *Parks v. Griffith and Boyd Company,* 117 Md. 494, 83 A. 559; 123 Md. 233, 91 A. 581. A contract in other respects definite in its mutual provisions may lose most of its meaning and binding force through express provision for termination at will. "An express provision for termination at will renders his promise illusory and unenforceable so far as it is executory." *Williston* on *Contracts* (Revised Edition). § 1027 A. *Cf. Standard Motor Company v. Shockey,* 139 Md. 127, 114 A. 869, a contract terminable not wholly at will, but only upon thirty days written notice, which is a contract for at least thirty days. *Williston, supra.* But modern exclusive distribution contracts usually are not illusory. "Modern industry has increasingly resorted to two general types of exclusive contracts for the distribution of its products, namely, the exclusive sales agency contract and the exclusive sales and distribution contract, or a combination of these. Though there is a marked distinction between a true sales agency contract and a sales and distribution contract for many purposes, yet for the purpose of determining the duration of the relation between the parties and the power to terminate it, they are essentially the same, and cases of either type are authoritative on this point for the other.

"Any one of these types of agreement, however, since they are bilateral in nature, imposes weighty obligations on both sides during its continuance. Usually, the agent or buyer, as the case may be, is doing more than merely offering to render services or to pay the price for the goods. It is at least expected and understood, and, in fact, frequently expressly provided in the contract, that he is to make a substantial investment and to build up or maintain a business establishment for the distribution of the manufacturer's products. On the other hand, the manufacturer intrusts the fate of his product in the

defined territory exclusively to this agent or distributor, and, in thus forbearing to resort to other sources of distribution in that locality, he gives up a valuable right. The validity of such exclusive sales agencies or of such exclusive sales and distribution contracts during their continuance is obvious. As executory agreements, they are binding if they satisfy the requisites of manifested mutual assent and consideration.

"Such difficulty as exists in protecting the agent or distributor from the hardship of summary termination is due either (1) to the actual or supposed lack of any definite period fixed in the manufacturer's promise, or (2) to the actual or supposed ability of the agent or distributor to terminate the arrangement at will, or both. To meet these objections, it is necessary to find an express or implied definition of the period of the manufacturer's obligation, and either a similar definition of the agent's or distributor's period of undertaking, or else that the agreement fairly interpreted gives the agent or distributor an enforceable option to hold the manufacturer for a fixed or reasonable time while remaining free himself to terminate the relation at will." *Williston, supra.*

If the exclusive agent or distributor may terminate his relations with the principal at will or upon reasonable notice, the contract should be construed as giving the principal the same right in the absence of provision to the contrary. *Willcox and Gibbs Sewing Machine Company v. Ewing,* 141 U. S. 627, 635, 12 S. Ct. 94, 35 L. Ed. 882. The *Willcox and Gibbs* case has been followed in many cases, state and federal, in holding an exclusive agency or distribution contract terminable by either party at will or upon reasonable notice. Like other cases, however, it depends upon the terms of the contract. There were an 1867 and an 1874 contract. The court said, "If this action was based upon the agreement of 1867, there would be some ground for holding that the company was obliged, by that agreement, to continue Ewing as agent so long as he performed its stipulations.

We are only concerned, however, with the agreement of 1874, which materially differs from that of 1867, and expressly provides that all prior contracts between the parties 'are hereby nullified and satisfied'. It is only for a breach of the contract of 1874 the plaintiff sues." 141 U. S. 634-635, 12 S. Ct. 96.

In the instant case the alleged lack of mutuality is the absence of a provision that plaintiff shall buy any specific number of machines after the initial purchase. Such a minimum requirement is no more essential in this contract than it is in a patent license contract. Many such contracts contain a minimum royalty provision, many do not. In the instant case the provision for minimum purchases was stricken out. The plain meaning of the basic provision that "the Seller agrees to sell and the Distributor agrees to purchase" is that Distributor agrees to purchase as many machines as, by his best endeavors, he is able to sell. *Hendler Creamery Company v. Lillich,* 152 Md. 190, 136 A. 631, 60 A. L. R. 207, was the converse of the instant case. It was contended that the contract lacked mutuality because the seller was not obligated to sell. This contention was rejected on two independent grounds, each applicable in the instant case. An express obligation of the seller to install machinery for the buyer was held a sufficient consideration for the buyer's undertakings to enable the seller to enforce them by injunction. So in the instant case construction of plaintiff's batting range is sufficient. Defendants argue that construction of the batting range was not an agreement by plaintiff, but only a condition of relieving plaintiff of an obligation to buy machines within six months. A contract provision may be an agreement or a condition or both. Ordinarily agreements of one party are conditions of performance by the other. To hold that the "understanding" that plaintiff should construct the batting range was less than a binding understanding would do violence to the words and the purpose of the contract, especially in view of the cancellation of the provision that plaintiff

was "obligated to purchase ———machines in any twelve months period". In the *Hendler* case it was also held that an obligation of the seller to sell was clearly implied. "In addition, while the contract does not, in words, express that the appellant is bound to furnish to the appellee the articles which the appellee agreed to purchase during the term specified, nevertheless, it is abundantly apparent that the intention of the parties, gathered from the whole contract, was that the appellant agreed to sell and furnish such articles to the appellee. The contract, in effect, is that the appellant offered to install the refrigerating apparatus upon the appellee's premises, and furnish him frozen commodities to the extent of his requirements, which, when accepted by the appellee by his agreeing to purchase such commodities and to refrain from purchasing like commodities from others, constituted a contract binding upon both parties, containing the implied agreement of the appellant to furnish the commodities which the appellee agreed to buy." 152 Md. 200-201. In *Wood v. Lucy, Lady Duff-Gordon*, 222 N. Y. 88, 90-91, 118 N. E. 214, cited with approval in the *Hendler* case, the court by Judge Cardozo said, "It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view to-day. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed (Scott, J., in *McCall Co. v. Wright*, 133 App. Div. 62, 117 N. Y. S. 775; *Moran v. Standard Oil Co.*, 211 N. Y. 187, 198, 105 N. E. 217). If that is so, there is a contract." In *Jay Dreher Corporation v. Delco Appliance Company*, 2 Cir., 93 F. 2d 275, 277, the court by Judge Learned Hand said, "* * * the only question which can arise as to the promise of defendant at bar is whether it intended to 'grant' an exclusive 'franchise'. In terms it did not

do so, but that was what it meant, and what the plaintiff expected." In *Thomas A. Edison, Inc. v. Blackman Distributing Company,* 2d Cir., 66 F. 2d 722, 728 the court by Judge Augustus Hand said: "It would defeat its purposes if agreements to purchase and sell were not implied. While the word 'requirements' was not used, it must be supplied to render what was plainly a contract founded on mutual promises intelligible and effective. The plaintiff, having appointed the defendant distributor and obtained from the latter a promise to deal exclusively in plaintiff's products, would not fulfill its contract unless it to a reasonable extent filled defendant's orders."

The contention that the contract is terminable at will because it contains no provision for a definite term also depends upon construction of the contract. "Where no definite time for termination is fixed on either side, but it is provided that the contract may be cancelled by one party, or by either party, at will, or upon notice, or upon written notice, or for designated cause, or for dissatisfaction. Under the influence of precedents dealing with the more simple master-and-servant relationship where it is less easy to find implications of mutual obligation and expected acts of detrimental reliance, the weight of authority has held this form of sales agency and distribution contracts, *other than those terminable for cause or dissatisfaction,* terminable at will with the consequent invalidation of the bargain as to future performance, on the ground that the executory promises are merely illusory." [Italics supplied.] *Williston, supra.* We need not now consider qualifications, which Williston discusses, of the statements just quoted. Section 10 of the contract expressly gives either party "the right to terminate the agreement * * * upon the happening of any one of [three specified] events of default." The only reasonable interpretation of section 10 is that the contract continues in force until terminated for cause—or at least continues for a reasonable time. Construction of the contract as terminable at will would defeat its purpose and would make section 10 meaningless.

The ultimate question presented is whether Foster-Porter had a right to terminate the contract because of breach by plaintiff in failing or refusing to make sales, and if it had such a right, whether it properly exercised it. Plaintiff contends that the contract could be terminated only in accordance with the provisions of section 10 and, therefore, under paragraph (a), after ten days notice "specifying the nature of the default". It seems, but is not clear, that Judge Moser took this view. Defendants contend that section 10 does not apply to the kind of breach alleged. We do not fully agree with either contention. Unless a contract provision for termination for breach is in terms exclusive (*Bartol v. Gottlieb-Bauernschmidt-Straus Brewing Company,* 129 Md. 32, 98 A. 286), it is a cumulative remedy and does not bar the ordinary remedy of termination for "a breach which is material, or which goes to the root of the matter or essence of the contract". *Williston,* § 842; *cf. Keystone Engineering Company v. Sutter,* 196 Md. 620, 628, 78 A. 2d 191, 195. Section 10 is similar to usual default provisions in bond mortgages and other instruments under which securities are issued. Such default provisions ordinarily are cumulative, not exclusive (*Chicago and Vincennes R. Co. v. Fosdick,* 106 U. S. 47, 68, 1 S. Ct. 10, 27 L. Ed. 47, and when in terms exclusive, are strictly construed. *Guaranty Trust Company v. Green Cove Railroad,* 139 U. S. 137, 141-142, 11 S. Ct. 512, 35 L. Ed. 116. If plaintiff had committed a material breach of his contract, Foster-Porter could have terminated the contract without regard to the provisions of section 10. Under section 10 the contract could be terminated for a breach of obligation which did not amount to a material breach.

The most bitterly controverted question of fact in this case is whether plaintiff committed a material breach of contract by failing or refusing to sell machines. Other alleged breaches do not merit discussion. It seems that Judge Moser found that there was no "good, sufficient or valid reason" for termination of the contract. He

found that it was not terminated for any such reason and he did not affirmatively find that there was any such reason for terminating. We find no convincing evidence either that plaintiff refused in bad faith, or "chilled", sales or that the Fosters, before or after July 11th, were able to make and deliver machines—with automatic feeds—within any dependable time. The fact that defendants did not notify plaintiff of the nature of his "serious and flagrant breach" of the contract does not suggest confidence that they knew just what it was. As we have said, we are not convinced that Judge Moser was wrong, or that the burden of proof has been sustained, as to breach of contract.

Defendants deny plaintiff's right to relief in equity, by injunction, by way of negative specific performance. The right to such relief is expressly affirmed, without elaboration, in the *Hendler* case. Exclusive distribution contracts are a recognized subject for enforcement, by injunction, of express (or in America, implied) negative covenants or agreements. *Lumley v. Wagner*, 1 DeG., M. & G. 604; *Armstrong v. Stiffler*, 189 Md. 630, 634-635, 56 A. 2d 808; *Mantell v. International Plastic Harmonica Corporation*, (Court of Errors and Appeals), 141 N. J. Eq. 379, 390-394, 55 A. 2d 250, 173 A. L. R. 1185. In so far as objection to equity jurisdiction is based on adequacy of the remedy at law, the statute is an independent ground of jurisdiction in Maryland. Acts of 1888, chs. 260, 263; Code, Art. 16, secs. 92, 255.

What is the legal effect of the decree declaring the contract in full force and effect but dissolving the injunction we do not undertake to say. As we have said, plaintiff is entitled to relief by injunction, against violation of the March 13, 1950 contract by refusing to sell to plaintiff or by making or carrying out any agreements with others for sale or distribution in contravention of that agreement. Plaintiff is also entitled to an accounting for damages for sales made in violation of the contract.

Plaintiff has moved to dismiss defendants' appeal under Rule 40, section 2, bceause defendants' brief was not filed in time under Rule 40, section 1. The transcript was filed on February 1, 1951, defendants' brief on March 13th, *i.e.,* eleven days late, plaintiff's brief on April 2nd, defendants' reply brief on April 7th, all able and helpful briefs. Defendants reply, *tu quoque,* as plaintiff is also an appellant. Defendants also say that the hearing of the case was not delayed and no one has been prejudiced. The rule does not specifically mention cross-appeals, and we think it cannot properly be construed as defendants suggest. Rule 40, section 2, provides that "when, according to this rule, an appellant is in default, the case may be dismissed * * *." More than once we have dismissed appeals for failure to comply with Rules 36 and 39 relating to appendices to briefs. Naturally we are loath to dismiss an appeal because a brief, able and helpful, is filed late, if in fact the hearing has not been delayed, no one has been prejudiced and the work of the court has not been impeded. It should not be lightly assumed that no one is prejudiced by delay. The intervals between appellant's brief, appellee's brief, reply brief and oral argument are deemed essential to the work of the court, especially in cases (like this case) which abound in clashing assertions of law or fact. If the appellant's brief is filed late, that is the cause of delay in the time for filing the other briefs. The court cannot underwrite guesses as to recesses, holidays, assignments and the like. Whether or not to dismiss an appeal under Rule 40 is discretionary. In the circumstances the motion is denied.

> *Decree reversed and cause remanded for passage of a decree in accordance with this opinion, costs in this court to be paid by defendants, costs in the lower court to be paid, one-half by plaintiff, one-half by defendants.*