705 A.2d 1

Stewart D. SACHS,

v.

**REGAL SAVINGS BANK, FSB et al.**

**No. 757, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Jan. 14, 1998.

Gerson B. Mehlman (Mehlman & Greenblatt, L.L.C., on the brief), Baltimore, for appellant.

James T. Heidelbach (James M. Smith and Gebhardt & Smith, on the brief), Baltimore, for appellees.

Argued before MOYLAN and HARRELL, JJ., and ROSALYN B. BELL, J. (retired, Specially Assigned).

MOYLAN, Judge.

When both sides in a case move for summary judgment, the trial judge must be prepared to shift perspective quickly and decisively before moving from the resolution of one of the motions to the resolution of the other. A single view of what is before the court will not do.

The appellant, Stewart D. Sachs, sued the appellee, Regal Savings Bank, FSB, *et al.*, in the Circuit Court for Baltimore County, for breach of an employment contract. After discovery had been completed, both the appellant and the appellee moved for summary judgment. The circuit court denied the appellant's motion for summary judgment in his favor and granted summary judgment in favor of the appellee. On this appeal, the appellant raises essentially two contentions:

1. That the trial judge erroneously failed to grant summary judgment in the appellant's favor; and

2. That the trial judge erroneously granted summary judgment in the appellee's favor.

Before we undertake an analysis of what was before the trial court in this case, it is meet to have before us the controlling standard. In *Southland Corp. v. Griffith*, 332 Md. 704, 712, 633 A.2d 84 (1993), Chief Judge Murphy succinctly set it forth:

A trial court may grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2–501(e). Under this rule, "a trial court determines issues of law; it makes rulings as a matter of law, resolving no disputed issues of fact." *Beatty v. Trailmaster*, 330 Md. 726, 737, 625 A.2d 1005 (1993). In reviewing a disposition by summary judgment, an appellate court resolves all infer-

ences against the party making the motion. *Rosenberg v. Helinski,* 328 Md. 664, 674, 616 A.2d 866 (1992). Because a trial court decides issues of law when granting a summary judgment, the standard of appellate review is whether the trial court was legally correct. *Beatty,* 330 Md. at 737, 625 A.2d 1005; *Rosenberg,* 328 Md. at 674, 616 A.2d 866; *Heat & Power v. Air Products,* 320 Md. 584, 592, 578 A.2d 1202 (1990).

It is not, of course, every genuine dispute of fact that will defeat summary judgment. It is only a genuine dispute as to a *material* fact that will do so. What, then, makes a factual dispute *material?* In the case before us, there is little, if any, dispute as to any of the first-level facts. There is a very real dispute, however, as to the significance of those facts. The significance to be afforded a given set of facts is sometimes and in some circumstances a question of law. That is not, however, the situation in this case. The significance to be afforded a given set of facts may also be, at other times and in other circumstances, a question of fact, to wit, a question of conclusory, abstract, or inferential fact. The possible inferential significance to be drawn in this case is a genuine dispute of fact.

For such an inference-drawing dispute to be deemed *material,* the balance in the case must be delicate enough that although a permitted inference in one direction would support summary judgment, a permitted inference in the opposite direction would defeat it. It was with this in mind that *Southland* advised:

> In reviewing a disposition by summary judgment, an appellate court *resolves all inferences against the party making the motion.*

*Id.* (Emphasis supplied).

Collectively, the two contentions in this case provide a textbook application of *Southland*'s direction to "resolve all inferences against the party making the motion." In analyzing, initially, whether the appellant should have been granted summary judgment in his favor, we are going to resolve every

possible inference against him. In then moving to the second contention, however, we are going to turn the telescope completely around and look at the same predicate facts with a diametrically different perspective. In analyzing whether the appellant should have suffered the grant of summary judgment against him, we are going to indulge every possible inference in his favor.

Our final conclusion is that neither party was entitled to summary judgment and that it should not, therefore, have been granted in either direction.

### The Underlying Facts

The appellant was hired in 1976, at twenty-five years of age, as the managing officer of Regal Savings and Loan, the predecessor to the primary appellee, Regal Savings Bank, FSB. Shortly thereafter, he assumed the titles of both President and CEO of the Bank. He was also named as President of Regal, a holding company and corporate parent of the Bank, and as an officer of five non-bank subsidiaries of Regal. In addition, he served as a member of the Board of Directors of Regal, the Board of Directors of the Bank, and the Board of Directors of each of Regal's non-bank subsidiaries.

As a financial manager, the appellant was eminently successful. In 1976, Regal Savings and Loan had approximately $800,000 in assets but no net worth. The appellant was given a free hand by the Bank's Board of Directors to turn things around financially. As of the time of his resignation in early 1993, Regal Bank had a net worth of $6 million with assets worth $40 million.

As successful as the appellant was in a purely financial sense, he progressively had growing difficulty in a very different sense. As, during the course of the 1980's, the original savings and loan association was converted first to a stock company and then to a savings bank, it became increasingly subject to federal rules regulating banks. The savings and loan crisis in the 1980's, moreover, led to increased federal regulation and supervision. Both appellant and appellee

agree that it was not simply a case that the appellant found it difficult to operate within the highly regulated environment that the banking industry had become. It was rather the case that the appellant was openly and almost belligerently disdainful of such regulations.

Although continuing to value highly the appellant's financial skill and judgment, the Board of Directors became increasingly embarrassed by and leery of his almost contemptuous spurning of regulations which he deemed to be, at best, a nuisance to be avoided wherever possible. Accordingly, the Board of Directors of the Bank determined in early 1993 that the appellant should relinquish his duties as President and CEO of the Bank.

The appellant and the Bank mutually agreed upon a course of action. A search committee was formed to locate a new President and CEO. That new President would be responsible for the day-to-day operations of the Bank but the appellant would continue to be responsible for its business development as well as for the management of the holding company and the non-bank subsidiaries. By March of 1993, however, several candidates for President and CEO had been interviewed but none had been hired. On March 8, the appellant tendered his resignation as President and CEO.

At a special meeting of the Board of Directors on March 18, his resignation was accepted. The Board agreed, however, that the appellant would continue to hold his remaining positions both with Regal and with the non-bank subsidiaries. He would, moreover, serve as a "consultant" to the Bank. In that capacity, he would continue to receive the salary and the benefits that he had been receiving as President and CEO. That salary agreement would continue for a period of two years ending March 31, 1995. The minutes of the Board of Directors meeting of March 18 memorialized the agreement between the appellant and the Bank:

> The Board accepted the resignation of Stewart D. Sachs as President of Regal Savings Bank, FSB. Mr. Sachs will retain his position as President and Chief Executive Officer

of Regal Bancorp and will also remain as a member of the Board of Regal Savings Bank, FSB. Mr. Sachs' salary and benefits will continue to be paid for a period of two years ending March 31, 1995. During this time Mr. Sachs will serve as a consultant to the Bank so that the Bank may utilize the experience accumulated by Mr. Sachs during the years that he was President. Duties performed by Mr. Sachs on behalf of other subsidiaries of Regal Bancorp will be charged to those operations accordingly.

### *There Was a Contract of Employment*

█ In clearing away the clutter, one issue may be quickly disposed of. In arguing that it was entitled to summary judgment, the Bank puts forth as an alternative position that the appellant was an at-will employee and could, therefore, have been dismissed by it at any time. The circuit court, however, ruled to the contrary. That legal ruling was not appealed by the Bank. It was, of course, not appealed by the appellant, who prevailed on the issue. The ruling was, moreover, in our judgment, correct:

A review of the pleadings and their attached exhibits demonstrate that the memorialization of the parties' agreement regarding the Plaintiff's consulting position is found within the Bank's Board of Directors' minutes from its March 18, 1993, meeting. Specifically, it is stated that "Mr. Sachs's salary and benefits will continue to be paid for a period of two years ending March 31, 1995. During this time Mr. Sachs will serve as a consultant to the bank ..." This language appears abundantly clear and unambiguous, leaving this Court no room for construction. Accordingly, it must be presumed that the parties meant what they expressed. *Gen'l Motors Acceptance Corp. [v. Daniels],* 303 Md. at 261–62 [492 A.2d 1306]. Unlike other cases resolved by the appellate courts of this State which uncovered ambiguity in the language utilized in employment agreements, here there are no precatory words such as "I expect," "assuming" or "anticipating." *See Shapiro [v. Massengill],* 105 Md.App. at 755 [661 A.2d 202]. Use of an exact date of

termination of the agreement bolsters the Plaintiff's contention that this agreement was for a fixed term, and not at will.

## The Termination of Employment

Shortly after the appellant resigned as President, an independent auditor conducted an audit of the Bank's business accounts. He advised the Bank that a review of the records revealed a pattern of improper banking activity relating to accounts that were controlled either by the appellant himself, the appellant's family, or entities that were either owned, controlled, or closely affiliated with the appellant. Specifically, the auditor noted that the appellant had accumulated approximately eight hundred "overdrafts" as a result of writing checks for which there were insufficient funds in the accounts and that, contrary to both bank policy and federal regulations, no "overdraft fees or interest" were charged against the accounts. The bank typically assessed a $25 penalty for each overdraft, as well as any interest that would have accumulated as a result of a negative balance. Thus, the Bank claims, it lost approximately $25,000 in revenue as a result of the appellant's actions.

Two members of the Bank's Board of Directors confronted the appellant with the audit. He did not deny any of the information presented nor did he attempt to explain his actions. He was requested to resign all of his remaining positions with the Bank or face termination for cause. On April 2, 1993, he resigned his remaining positions. On April 2, the Board of Directors for the Bank and the Board of Directors for Regal Bankcorp held special meetings at which each board formally accepted the appellant's resignation. Each Board voted to "rescind Mr. Sachs' two year consulting agreement as detailed in [its] resolution of March 18."

## The Issue: Was There "Just Cause" for the Termination?

The appellant sued the Bank for breach of contract for terminating his employment as a consultant within the two-year period. The Bank's position is that the appellant's

actions with respect to the non-payment of penalties for overdrafts, in violation of the Bank's own internal rules and in violation of federal regulations, constituted a material breach of the contract, as a matter of law, and thereby relieved the Bank of its reciprocal duty of performance.

The law is clear that a breach of contract will be deemed material if it affects the purpose of the contract in an important or vital way. The settled Maryland law in this regard was enunciated by *Chai Management, Inc. v. Leibowitz,* 50 Md.App. 504, 513, 439 A.2d 34 (1982):

[W]hen the contract is for a stated term, it may only be terminated before the end of the term by just cause.

*See also Shapiro v. Massengill,* 105 Md.App. 743, 756, 661 A.2d 202 (1995); *Dorrance v. Hoopes,* 122 Md. 344, 350, 90 A. 92 (1914).

The fact of the overdrafts is not in dispute. The significance of the overdrafts very definitely is. It is the appellant's position that the overdraft situation was so unequivocally a *non-material* breach that summary judgment should have been granted in his favor. He asserts that the undisputed evidence demonstrated, as a matter of law, that *just cause did not exist* to justify the Bank's termination of his employment contract.

The Bank's position, by contrast, was that the overdraft situation was so unequivocally a *material* breach that summary judgment should have been granted in its favor. It asserts that the undisputed evidence demonstrated, as a matter of law, that *just cause did exist* to justify the termination.

Although both appellant and appellee eschew the middle ground, no less than three possibilities existed at the summary judgment stage of the proceedings: 1) just cause existed, as a matter of law; 2) just cause was lacking, as a matter of law; and 3) just cause may or may not have existed, as a matter of fact.

As we turn to the two contentions raised by the appellant, the observation by Judge Hollander in *Shapiro v. Massengill,*

105 Md.App. 743, 760, 661 A.2d 202 (1995), is the star by which we steer:

The concept of "just cause" does not lend itself to a mathematically precise definition. Indeed, "[t]here is no single definition of what constitutes good cause for discharge." Stanley Mazeroff, *Maryland Employment Law* § 3.3(A), at 189 (1990). Rather, whether conduct amounts to "just cause" necessarily varies with the nature of the particular employment. Simply put, what satisfies just cause in the context of one kind of employment may not rise to just cause in another employment situation.

### *Resolving All Inferences Against the Appellant*

We turn first to the appellant's contention that summary judgment should have been granted in his favor. As we examine that contention, we will, pursuant to *Southland,* 332 Md. at 712, 633 A.2d 84, resolve every inference against him and in favor of the Bank. Utilizing that perspective, we could not describe that hypothetical landscape better than did the circuit court in ruling on the motion for summary judgment:

Plaintiff's deposition testimony is replete with evidence supporting Defendants' termination of Plaintiff for wrongful conduct. Through his testimony Plaintiff openly admitted his flagrant violation of both federal banking law and internal bank regulations. Specifically, Plaintiff permitted overdrafts in accounts that he and persons affiliated with him maintained at the bank in violation of 12 C.F.R. § 563.43 and 12 C.F.R. § 215.4(e), which prohibit a banking institution from paying an overdraft of an executive officer or director of the institution, or an executive officer or director of its affiliates, on an account at the institution.

The uncontradicted evidence revealed by the independent auditor conclusively determined that Plaintiff violated this federal prohibition against overdrafts in officer accounts. Plaintiff accumulated 47 overdrafts in his two personal accounts during 1992 and early 1993. Additionally, his other businesses, including Attsgood Realty, Stewart D. Sachs Realty, L & S Investment, and Valley Pine Mortgage,

had a total of 202 overdrafts. Accounts of Plaintiff's wife and secretary also had abundant overdrafts.

In order to avoid penalties for his overdrafts, Plaintiff decided that no overdraft fees be assessed and that no interest be charged in connection with any overdrafts that occurred. Importantly, this conduct was prohibited by Regal's internal policies and procedures, which specifically prohibited overdrafts in employee accounts, as well as in accounts that officers, directors and shareholders maintained at the bank. In fact, it was made known during Plaintiff's deposition that these policies were put into effect by Plaintiff while serving as President. Upon being confronted with this fact Plaintiff openly admitted that he did not care about policies such as these as they affected his own practices.

From these admissions it is clear to this Court that Defendants had sufficient "just cause" to terminate Plaintiff prior to the stated time for expiration of the parties' agreement. Throughout his tenure with the various Defendants, Plaintiff had held positions including president, chief executive officer, and director. In no uncertain terms Plaintiff claimed to run the bank singlehandedly at times. In his own words Plaintiff claims that "the bank was me. I was doing everything. The bank's profits were generated by myself. The deposits were generated by myself. It was my energy that ran the bank." Plaintiff, probably more than anyone else, was in a position where faith and trust were essential.

■ Against the background of that possible scenario, the appellant's argument obviously cannot prevail. At the very least, a jury would have been permitted to infer that the Bank, indeed, had just cause to terminate the appellant's employment. The mere possibility of drawing such a fact-finding inference represents, *ipso facto*, a genuine dispute as to a material fact calling for a trial on the merits. The appellant's motion for summary judgment in his favor was properly denied.

A similar resolution was made in *Chai Management, Inc. v. Leibowitz,* 50 Md.App. 504, 514, 439 A.2d 34 (1982):

> Considering the evidence in the light most favorable to the employer, the evidence clearly raised a question of whether there was a material breach of the contract that would justify dismissal of the employee. The trial judge should have denied [the employee's] motion for a directed verdict and submitted the case to the jury for its determination as to whether the [employee] breached the contract.

### Resolving All Inferences Against the Bank

From that predicate inference or set of inferences, moreover, it would be easy to leap to the other extreme and to conclude that summary judgment should actually have been entered in favor of the Bank. That is a common mistake in summary judgment cases. Judges frequently move directly from one ruling to the next without stopping to change the lens. Such a follow-up ruling in this case would have been a mistake, however, because, as attention shifts from the denial of summary judgment in favor of the appellant to possible summary judgment in favor of the Bank, that initial inference or set of inferences on which the first ruling depended totally disappears. The judicial analyst must start over from the beginning and, in doing so, must assume a diametrically different outlook on what is before him.

In examining the appellant's second contention, that summary judgment should not have been granted against him and in favor of the Bank, we must, again pursuant to *Southland,* 332 Md. at 712, 633 A.2d 84, resolve every inference against the Bank and in favor of the appellant. The picture that could permissibly emerge from that drastically altered perspective is significantly different from the earlier picture.

The undisputed evidence permitted the conclusion that the appellant was a talented but difficult person, a financial wizard who nonetheless, as a front man, became an increasing embarrassment because of his contemptuous disdain for federal banking regulations. In an effort to retain the best of the

appellant but to get rid of the worst, the Bank had him resign as President and CEO but continued to enjoy the benefit of his knowledge and experience by hiring him as a consultant. The minutes of the Board of Directors meeting recorded that he would "serve as a consultant to the Bank so that the Bank might utilize the experience accumulated by [him] during the years that he was President."

Whatever embarrassing missteps he may have been guilty of as President, such as the overdrafts, had nothing to do with his subsequent services purely as a consultant and, therefore, could not serve as just cause for terminating his employment as a consultant.

The undisputed evidence could also have supported the appellant's suggestion that the entire subject of the overdrafts was a "tempest in a teapot." Many employees of the Bank had been familiar for years with his overdrafts as routine occurrences. The reason for them was that the appellant controlled numerous accounts and whenever an overdraft would occur with respect to one of them, he simply directed the transfer of money to that account from one of the other accounts. The Bank was never the ultimate loser. The evidence also supported the conclusions that penalties were not charged for overdrafts if the depositor was a good customer of the Bank and the appellant certainly qualified as a good customer.

To the Bank's argument that its own regulations did not permit the forgiving of the penalty in the case of a Bank employee, the appellant's response was that he was the author of that regulation and that, although the position may smack of arrogance, he who makes the law may break the law. To the Bank's alternative argument that it was a violation of federal regulations for a Bank employee to be forgiven the penalty for overdrafts, the appellant's position was clear. He was disdainful of such federal regulations and, with the full knowledge of the Bank's Board of Directors over the years, had always been disdainful of such regulations. Indeed, Albert Kishter, the Chairman of the Bank's Board of Directors,

said with respect to the appellant, "When a man makes money for you, you have to be satisfied."

Drawing all possible inferences against the Bank and in favor of the appellant, a jury could conceivably have found that the actions of the appellant prior to becoming a consultant did not represent a material breach of his consulting contract and that the Bank, therefore, did not have just cause to terminate his services as a consultant. The mere possibility of drawing such inferences represents, *ipso facto*, a genuine dispute as to a material fact calling for a trial on the merits. The Bank's motion for summary judgment should not have been granted.

### *Conclusion*

Although there was no dispute in this case as to the first-level facts, there was a genuine and material dispute as to the significance of those facts. The undisputed facts were capable of supporting inferences in opposite directions. There was a genuine dispute as to how much weight to give to certain of the undisputed facts versus other undisputed facts. Such alternative possibilities are classic grist for the fact-finding mill. Summary judgment should not have been granted in either direction.

Summary judgment is no substitute for a trial. The Bank may well prevail on the ultimate merits, but if it does, it will have to do so on the merits and as the result of a trial.

JUDGMENT REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.