722 A.2d 377

**REGAL SAVINGS BANK, FSB et al.**

v.

Stewart D. SACHS.

No. 32, Sept. Term, 1998.

Court of Appeals of Maryland.

Jan. 7, 1999.

James M. Smith (James T. Heidelbach, Gebhardt & Smith, L.L.P., on brief), Baltimore, for Petitioners.

Gerson B. Mehlman (Mehlman & Greenblatt, L.L.C., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

Here the plaintiff alleges that a bank and its holding company forced his resignation as a consultant to the bank, thereby breaching a contract between the parties for two years of future employment in that capacity. The defendants assert that the circuit court properly entered summary judgment in their favor because there was good cause for terminating plaintiff's employment as a consultant based on the plaintiff's overdrafts while serving as the bank's president under an at-will contract that immediately preceded the consulting contract. For the reasons set forth below we agree with the holding by the Court of Special Appeals in *Sachs v. Regal Sav. Bank, FSB*, 119 Md.App. 276, 705 A.2d 1 (1998), that the circuit court erred in granting summary judgment for the defendants.

Plaintiff, and respondent here, is Stewart D. Sachs (Sachs). He was hired in 1976 as the managing officer of a state-chartered savings and loan association that evolved into Regal Savings Bank, FSB (the Bank), one of the defendants and petitioners. Over time Sachs was elected president, CEO, and a director of the Bank which in 1981 converted from a mutual association to a stock company. Sachs also was elected president and a director of Regal Bancorp., Inc. (Regal), the Bank's corporate parent and the other defendant-petitioner. Regal owned five nonbank subsidiaries, and Sachs was an officer and director of each of these nonbank subsidiaries.

I

Because this is a case that was decided on summary judgment, we are obliged to resolve most favorably to Sachs, as the party opposing summary judgment, all conflicts of fact and all inferences that reasonably may be drawn from the facts. Further, the record in this case, with the exception of certain documents that are discussed, *infra,* consists primarily of the testimony on deposition of Sachs. Although several directors and an employee of the Bank were deposed, only a few short excerpts from their depositions are included in the record—quite possibly in recognition by the Bank that conflicting evidence, for purposes of a motion for summary judgment, would be reconciled against the Bank, as movant. Thus, it is through Sachs's eyes that we obtain a description of the business atmosphere at the Bank and of the relationship between Sachs and the Bank's board of directors. As we shall see, that description does not conform to the average person's model for a bank.

Sachs demonstrated considerable skill in generating business for Regal and its subsidiaries. When he was hired by the Bank at age twenty-five it had assets of $800,000 and no net worth. When he was forced to resign in 1993 the Bank held assets of $40 million and had a net worth of approximately $6 million. During the first ten years of Sachs's employment by the Bank he worked very hard on its business, and in the seven years preceding his forced resignation he also engaged in personal business pursuits, using the Bank as his base of operations with the full knowledge of its board of directors. During the latter period approximately seventy-five percent of his time was spent on Bank business and twenty-five percent on his personal business. His personal business included *mortgage lending,* equipment leasing, and investments in rental real estate. Sachs "had a free hand to do almost anything [that he] wanted to do that was legal." In 1986 Sachs, together with a twenty-five percent stockholder and director in the Bank, *started another bank* in which a number of the members of the board of Regal became investors. During his last year of employment at the Bank, Sachs was spending two

days a week in New Jersey, where he had a business venture, and only three days a week at the Bank.

In December 1991 Sachs, as president of the Bank, circulated a revision to the Bank's employees manual advising that overdrafts were "not permissible," that the items would be returned unpaid, and that the employee's checking account privilege would be discontinued, at the option of the Bank, if there were three overdrafts within a six month period. In April 1992 Sachs, together with the other officers and directors of the Bank, signed a policy statement dealing with the avoidance of conflicts of interests. Paragraph three of that statement provided:

"The Bank is prohibited from paying an overdraft on an account of any of its affiliated persons. The overdraft prohibition is not applicable to a principal shareholder who is neither a director nor executive officer of the Bank (or to a related interest of such shareholder)."

In October 1992 Sachs and his secretary respectively furnished the Bank's check processing department with two lists of accounts at the Bank. The first listed accounts of Sachs or of his secretary and accounts of certain of their respective related interests. The second list was of other accounts from which money was to be transferred to cover overdrafts in the accounts on the first list, upon contacting Sachs's secretary. A further memorandum, dated March 11, 1993, that was sent to a specific employee in the check processing department referred that employee to the October 1992 memorandum and again requested that overdrafts be referred to Sachs's secretary for approval of the withdrawals from other accounts to cover any overdrafts.[1]

For the first part of Sachs's employment by the Bank its accounts were insured by a private insurer, but in the latter part of Sachs's career with the Bank its accounts were federally insured and its operations subject to regulation by the

---

1. There was evidence that, following the March 1993 memorandum to the check processing department, overdrafts continued to be handled in the same manner as previously.

Office of Thrift Supervision (OTS). Sachs was openly contemptuous of the federal regulatory requirements which he repeatedly described on deposition as "bull ____." By early 1993 Sachs had formed the idea that he would resign as president of the Bank, an idea that he discussed with the executive committee of the Bank's directors. A number of factors led to Sachs's decision. He knew that the board was uncomfortable about his outside activities and that the directors were concerned about personal liability based on his conduct. He knew that the board wanted someone of whom the federal regulators would approve. Further, Sachs had become somewhat "disgusted" with the increasing pressure over the prior year that the number two operating officer of the Bank, vice president Allen Holzman, was putting on Sachs by "reviewing so-called conflicts of interest" of Sachs in his other business activities.

As a result, in early 1993, the board formed a search committee to locate a new president and CEO, who would be responsible for the day-to-day operations of the Bank. Sachs would continue to be responsible for business development for the Bank, as well as for management of Regal and its nonbank subsidiaries.

On March 8, 1993, when Sachs's replacement had been selected but not yet hired, Sachs formally tendered his resignation as president and CEO of the Bank. It was accepted at a special board meeting on March 18, 1993. The board agreed that Sachs would continue to hold his remaining positions with Regal and its subsidiaries and serve as a consultant to the Bank. The board further agreed that Sachs would continue to receive his current salary (which was $127,000 per year) and benefits for a period of two years beginning April 1, 1993, and ending March 31, 1995. Arrangements were made for Regal to sublet an office for Sachs at a nearby location out of the Bank's headquarters. Sachs continued to manage the day-to-day operations of the Bank, pending the commencement of work by the new president.

On March 29, 1993, the Bank's independent auditors advised the audit committee of the board that Sachs, certain members of Sachs's family, and entities owned or controlled by Sachs or by his secretary had incurred numerous overdrafts in twenty-four accounts at the Bank, but that no overdraft charges or interest had been assessed in connection with any of those overdrafts. A subsequent analysis by the auditors that is presented by petitioners in support of summary judgment determined that these persons and entities had accumulated 799 overdrafts from January 1992 through March 1993. These overdrafts included 393 overdrafts in Sachs's personal and business accounts, 346 overdrafts in the accounts of Sachs's former wife and of his cousin, and 60 overdrafts in the accounts of his secretary who was also the Bank's corporate secretary. All overdrafts were eventually covered. At more times than not the Bank held the overdrafts for longer than one day—sometimes for days at a time. If a NSF charge of $25 had been imposed on each of these overdrafts, the charges would have totaled $19,975. The auditors also computed the average daily balance of the overdrafts for 1992 and the first quarter of 1993 in all of the same accounts. If interest at the rate of twelve percent per annum had been charged on the average daily balances in all of the accounts, the interest would have totaled $4,298.81.

On April 1, 1993, the Bank promulgated a not sufficient funds policy which provided in part:

"The check may be honored if the customer has less than three overdrafts during the last year. Checks from customers with a favorable long term relationship with [the Bank] may be honored with the approval of the Supervisor of Operations." [2]

On April 2, 1993, two of the Bank's directors confronted Sachs regarding the overdrafts. Sachs did not dispute the auditors' findings. The directors insisted that Sachs immediately resign all of his positions with Regal and its subsidiaries,

---

2. Neither Sachs nor his secretary was the supervisor of operations.

or he would be removed from those positions. Sachs chose to resign, effective April 2, 1993, as president of Regal and from the boards of Regal and the Bank. At a special meeting held on April 2, 1993, the Bank's board formally accepted Sachs's resignation. The minutes of that meeting read in part:

"The action was prompted by the Board becoming aware of deviations in the policies and procedures relating to overdrafts in employee checking accounts. Specifically, accounts controlled by or associated with Mr. Sachs and/or his secretary.... The Board voted to rescind Mr. Sachs' two year consulting agreement as detailed in its resolution of March 18."

Minutes of a meeting of the board of directors of Regal, also dated April 2, 1993, are identically worded. Shortly thereafter, Sachs resigned his remaining positions as an officer and director of each of Regal's nonbank subsidiaries.

Additional facts will be stated in the analysis of the arguments of the parties.

## II

Sachs instituted suit alleging that Regal and the Bank breached the contract to employ him as a consultant for a period of two years. Sachs demanded damages equal to the compensation and benefits he would have received over that two-year period. After discovery, Regal and the Bank moved for summary judgment on the ground, *inter alia*, that Sachs's admitted conduct violated federal banking law and the Bank's policies and constituted cause to terminate Sachs's employment. The circuit court granted summary judgment for the defendants, holding that the overdrafts furnished just cause.

On Sachs's appeal to the Court of Special Appeals, that court held that a jury issue was presented. *Sachs,* 119 Md.App. at 288, 705 A.2d at 6. Although agreeing with the defendants that the material facts regarding Sachs's misconduct were not in dispute, the court concluded that the undisputed facts were subject to conflicting inferences. The court reasoned that, viewing the undisputed facts in a light most

favorable to Sachs, an inference could be drawn that Sachs's misconduct was not sufficiently "material" to warrant the termination of his employment. *Id.*

We granted Regal's and the Bank's petition for certiorari. The petitioners submit that the decision below ignored well-settled principles of Maryland employment law, that it disregarded applicable federal banking regulations, and that it incorrectly applied the summary judgment standard.[3] On the other hand Sachs claims that there is evidence that the Bank's board knew of his failure to follow rules and regulations before he was rehired as a consultant so that the Bank should be precluded from using that misconduct as the basis for firing him. Further, Sachs argues that the standard for deciding whether the Bank had "just cause" for terminating his employment as a consultant hinges on whether he "materially breached" that contract and that the materiality of his conduct as president to his service as a consultant at least raises a jury question.

## III

█ The Court of Special Appeals correctly identified the principal issue to be the materiality of any misconduct in which Sachs was proved to have engaged as president of the Bank to his employment as a consultant. For the breach of duty by an employee to extinguish the obligation of the employer to pay future compensation under a contract of employment, the breach, even if willful, must be material. *St. Paul at Chase v. Manufacturers Life Ins. Co.*, 262 Md. 192, 217–18, 278 A.2d 12, 25, *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971); *Maryland Credit Fin. Corp. v. Hagerty*, 216 Md. 83, 92, 139 A.2d 230, 234 (1958).

Petitioners cite *Peurifoy v. Congressional Motors, Inc.*, 254 Md. 501, 255 A.2d 332 (1969), involving a contract of employment as the comptroller and general manager of an automo-

---

3. The verbatim text of the most pertinent regulation, 12 C.F.R. § 215.3(a)(2) (1993), set forth, *infra*, was not presented in petitioners' brief or appendix. *See* Maryland Rule 8–504(a)(7).

bile sales dealership. The employee, apparently due to mental health problems, was unable to perform. We affirmed the grant of a motion for judgment in favor of the defendant. Based on the testimony produced by the plaintiff, we held that he had breached the "constructive concurrent condition that [he] would render service as comptroller and general manager in a reasonably satisfactory manner and in accordance with generally accepted standards for that employment." *Id.* at 515, 255 A.2d at 339. The principle applied in *Peurifoy* is sometimes called the constructive condition of substantial performance. *New York Bronze Powder Co. v. Benjamin Acquisition Corp.*, 351 Md. 8, 20, 716 A.2d 230, 235–36 (1998); *Beckenheimer's Inc. v. Alameda Assocs. Ltd. Partnership*, 327 Md. 536, 554–55, 611 A.2d 105, 113–14 (1992); *see also* 3A A. Corbin, *Corbin on Contracts* § 679 (1960) ("The employer's duty to pay wages is almost always constructively conditional on the rendition of substantial performance of his promised service by the employee."). The condition referred to in *Peurifoy* is not one, the non-fulfillment of which terminates the employer's promised performance without regard to the substantiality of the employee's performance. This is made clear by *Peurifoy*'s citation to *Foster–Porter Enters., Inc. v. De Mare*, 198 Md. 20, 34, 81 A.2d 325, 332 (1951). *Peurifoy*, 254 Md. at 515, 255 A.2d at 339. At the cited pages in *Foster–Porter*, this Court said that "[u]nless a contract provision for termination for breach is in terms exclusive, it is a cumulative remedy and does not bar the ordinary remedy of termination for 'a breach which is material, or which goes to the root of the matter or essence of the contract.'" 198 Md. at 36, 81 A.2d at 333 (citations omitted).

## IV

The minutes of the petitioners' board meetings of April 2, 1993, evidence that the only assigned reason for "rescind[ing]" the consulting contract was the overdrafts. On the present record there is a factual issue whether the Bank's board knew of overdrafts prior to its March 18, 1993 approval of the consulting contract. Sachs testified that Holzman knew of the

overdrafts. Given the evidence of Holzman's penchant for complaining about Sachs's irregular conduct, a jury could infer that these complaints included the overdrafts and were communicated to the Bank's board. Further, Sachs testified that he and members of the board, including specifically the chairman of both boards, were engaged in business ventures together and that the accounts of those ventures were maintained at the Bank. From time to time the accounts of those ventures were overdrawn, but NSF fees were not assessed. Sachs says this was because "[n]obody cared" whether it was appropriate not to assess the fees. This evidence bears on the materiality of Sachs's overdrafts. It suggests that Sachs's overdrafts only became material after the Bank had found a new president while it remained obligated to pay Sachs $254,-000 over two years, plus benefits.

Also bearing on materiality are certain federal regulations that address overdrafts and that underlie the Bank's policies on overdrafts. A federal savings bank is a federal savings association that converted from a state chartered association under Section 5(o) of the Home Owners' Loan Act, 12 U.S.C. § 1464(o). By 12 U.S.C. § 1468(b) extensions of credit to executive officers, directors, and principal shareholders in federal savings associations are made subject to the restrictions, *inter alia,* of subsection (h) of Section 22 of the Federal Reserve Act, 12 U.S.C. § 375b. Section 375b(6)(A) (1993) provides that "[i]f any executive officer or director has an account at the member bank, the bank may not pay on behalf of that person an amount exceeding the funds on deposit in the account." The prohibition on executive officer and director overdrafts "does *not* prohibit a member bank from paying funds in accordance with ... (ii) a written preauthorized transfer of funds from another account of the executive officer or director at the bank." 18 U.S.C. § 375b(6)(B) (1993) (emphasis added). The Board of Governors of the Federal Reserve System may prescribe rules and regulations "to effectuate the purposes and prevent evasions of this section." § 375b(10).

To effectuate the purposes of § 375b the Board of Governors of the Federal Reserve System has adopted Regulation O. 12 C.F.R. § 215 (1993). Further, an OTS regulation makes a federal savings association subject to Regulation O "in the same manner and to the same extent as if the association were a bank and a member bank of the Federal Reserve System...." 12 C.F.R. § 563.43 (1993).

Regulation O defines an extension of credit to include "[a]n advance by means of an overdraft." 12 C.F.R. § 215.3(a)(2) (1993). The regulation specifically addresses overdrafts in relevant part as follows:

> "No member bank may pay an overdraft of an executive officer or director of the bank [3] on an account at the bank, unless the payment of funds is made in accordance with ... (2) a written, preauthorized transfer of funds from another account of the account holder at the bank. This prohibition does not apply to payment of inadvertent overdrafts on an account in an aggregate amount of $1,000 or less: *Provided,* (1) The account is not overdrawn for more than 5 business days, and (2) the member bank charges the executive officer or director the same fee charged any other customer of the bank in similar circumstances."

---

[3] ... This prohibition ... does not apply to the payment by a member bank of an overdraft of a related interest of an executive officer, director, or principal shareholder of the member bank."

12 C.F.R. § 215.4(e) (1993).

Petitioners' presentation to us of the economic detriment to the Bank of the overdrafts in the twenty-four accounts analyzed by the auditors greatly exceeds the scope of the prohibition in 12 C.F.R. § 215.4(e). That prohibition reaches only the accounts of an executive officer or director, but the petitioners' presentation includes the accounts of Sachs's former wife, his cousin, and his secretary. Further, the regulatory prohibition excludes "an overdraft of a related interest" of the executive officer or director. Under Regulation O a " '[r]elated interest'

means ... a company that is controlled by a person...." 12 C.F.R. § 215.2(k).[4] Petitioners' presentation includes the accounts of the various personal business ventures in which Sachs was engaged and which may or may not fall within the meaning of the phrase "related interests." Petitioners' presentation further includes overdrafts in the three and one-half months before the April 27, 1992 adoption of the Plan for Avoidance of Conflicts of Interest.

From the auditors' analysis there appear to be only two non-business accounts maintained at the Bank by Sachs. In calendar 1992 there were twenty-three overdrafts on those accounts for which NSF charges at $25 per occurrence would have totaled $575. In the first quarter of 1993 there were twenty-four overdrafts for which NSF charges at $25 per occurrence would have totaled $600. The lost interest for overdrafts on those accounts was computed to be $229.12 for all of 1992 and $87.02 for the first quarter of 1993. Thus, for those two accounts the claimed losses to the Bank for fifteen months were $1,491.14. During that period Sachs's salary was $158,750, plus bonuses, and unquantified benefits consisting of a car and health, life, and disability insurance. What the jury may consider to be a disproportion between the loss alleged by the Bank and the loss to Sachs is a factor to be considered on materiality.

---

4. The term "company" is defined to mean

"any corporation, partnership, trust (business or otherwise), association, joint venture, pool syndicate, sole proprietorship, unincorporated organization, or any other form of business entity not specifically listed herein. However, the term does not include:

"(1) An insured depository institution (as defined in 12 U.S.C. 1813); or

"(2) A corporation the majority of the shares of which are owned by the United States or by any State."

12 C.F.R. § 215.2(a). The phrase "control of a company" is defined in the regulation at length, and includes circumstances under which

"a person directly or indirectly, or acting through or in concert with one or more persons:

"(i) Owns, controls, or has the power to vote 25 percent or more of any class of voting securities of the company ...."

12 C.F.R. § 215.2(b)(1).

Sachs's overdrafts obviously present issues of integrity and responsibility. Complicating these issues, however, as just cause for termination are the arrangements that Sachs attempted to make with the Bank's check processing department in October 1992 which were reconfirmed by the March 11, 1993 memorandum. These arrangements appear to be an effort to comply with 12 C.F.R. § 215.4(e), the prohibition of which does not apply where there is "a written, preauthorized transfer of funds from another account of the account holder at the bank."

In addition, petitioners' presentation reflects that, in the thirty individual account-months analyzed by the auditors (i.e., fifteen months times two accounts), there were twenty-five months in which one or the other of Sachs's individual accounts was either not overdrawn or carried an average daily negative balance of less than $1,000. Under Regulation O, § 215.4(e) "inadvertent" overdrafts aggregating $1,000 or less are excluded from the prohibition if the account is not overdrawn for more than five business days (an element that cannot be determined from petitioners' presentation) and if the "bank charges the executive officer or director the same fee charged any other customer of the bank in similar circumstances." Sachs testified that he paid no NSF charges because of the Bank's policy to waive charges for good, long-term customers, of whom he considered himself to be one, based on the number of accounts that he and his related interests maintained at the Bank.

Sachs's deposition testimony was that at all times sufficient funds were on deposit in other accounts controlled by him to cover any overdraft in a particular account for which he was responsible. Further, there is no direct evidence that federal regulators ever complained to the Bank over the fact that Sachs was not paying NSF charges on overdrafts in his accounts.

The Bank's April 27, 1992 Plan for Avoidance of Conflicts of Interest addressed a number of subjects. Among these was a prohibition against overdrafts, then applicable to Sachs, and in

relevant part reading: "The Bank is prohibited from paying an overdraft on an account of any of its affiliated persons." This is apparently a reference to the prohibition of Regulation O, but the plan's prohibition is broader than the prohibition in Regulation O. The April 1992 plan also contained a notice section which in relevant part stated: "Officers who are found to have violated these regulations (i) may be required to return to the bank any benefits received and (ii) may be subject to dismissal."

On deposition Sachs agreed with the statement by counsel for the Bank that the April 1992 plan was intended basically to "mirror" federal regulations. As we have seen, *supra,* there are conflicting inferences whether violations of the federal regulations furnished Regal with just cause for terminating the consulting contract. Because the purpose of the plan was to "mirror" the regulations, the materiality of Sachs's violation of the Bank's overdraft policy in the plan is also subject to conflicting inferences.

V

Sachs's principal position, with which the Court of Special Appeals agreed, is that the petitioners have not demonstrated, as a matter of law, that the overdrafts are material to his new relationship to the Bank as a consultant. In order to demonstrate that the earlier overdrafts constituted just cause later to terminate the consulting contract, petitioners must demonstrate the materiality of the overdrafts to the new position.

At oral argument petitioners asserted that Sachs "very much viewed himself [as having] the ability to tell those little people that work down in the Bank to honor a check. . . ." To support this argument the petitioners principally rely on the passage from Sachs's deposition that is quoted in the margin.[5]

___

5. In one part of his deposition Sachs testified as follows:

"Q If before your resignation you were spending 75 percent of your time on Regal and 25 on other matters, what rough percentages did you envision over this next two-year period?

At no point does Sachs testify that, had he been permitted to remain as consultant, he would have caused Bank employees to honor his checks when there were insufficient funds. A trier of fact could interpret the quoted testimony to mean only that the duties and responsibilities that Sachs would have as consultant were not substantially different from those as president.

The reading favorable to Sachs is reinforced by other portions of his deposition. For example, he said, "I wouldn't be responsible for the day-to-day operations, but I would be

---

"A  I never envisioned anything. I just figured I did what I had to do.

"Q  Did you figure the time was roughly the same as you had been spending?

"A  I never gave it a thought. I would continue doing business day to day like I always did.

"Q  So what you're really saying, you didn't think it would change that radically?

"A  I didn't think it was going to change at all. It was going to change as far as in name only. It was changing to make the regulators happy. Otherwise, it was bull ____.

"Q  Changing in terms—

"A  It was only going to change in title.

. . . .

"Q  In the minutes, you state that during this two-year period, you will serve as a consultant to the bank. What did you mean by consultant?

"A  Everything I just told you in the last question. Same thing.

"Q  What you're saying is I'm going to do the same thing I used to do except now they will view me as a consultant instead of president of the bank?

"A  That's right.

"Q  And your compensation for these consulting services would just be the continuation of your existing salary?

"A  That's correct.

"Q  Was there to be any change in your mind in any aspect of your compensation from what you were receiving beforehand?

"A  No.

"Q  What you're really saying is you're just going to continue—

"A  I was just changing titles, that's all.

"Q  Changing titles for two years? Everything else stays the same?

"A  That's correct.

"Q  And they bring in another figurehead president to make the regulators happy?

"A  That's correct."

responsible for the lending and we would get somebody in there who would make the lending look a little cleaner." And further he said, "I could stay on for another two years—it was a pretty good deal—and I could formally devote less time instead of pretending to."

Even if Sachs's statement that "[e]verything else stays the same" is taken literally, the statement is not conclusive against Sachs on summary judgment because there is direct evidence to the contrary.

This Court has considered, but has not adopted, the doctrine of judicial admission under which " 'a party to a suit is bound by a definite statement of fact within his knowledge, objective or subjective. . . .' " *Ferguson, Admin. v. Wootten,* 240 Md. 186, 192, 213 A.2d 498, 501 (1965) (quoting *Eastern Shore Pub. Serv. Co. v. Corbett,* 227 Md. 411, 418, 177 A.2d 701, 705 (1962)). In *Ferguson* the plaintiff, a passenger in an automobile that was involved in a motor vehicle accident at an intersection controlled by a traffic light testified that her host had the green light. Other witnesses testified that the host driver ran a red light. We held that the plaintiff's version of the events was not conclusive so that a directed verdict in favor of the estate of the host driver was properly denied. *See also Savage v. Mills,* 237 Md. 204, 205 A.2d 239 (1964) (plaintiff passenger's testimony that host driver was not negligent not conclusive where other evidence showed host failed to obey boulevard stop sign); *Welsh v. Porter,* 231 Md. 483, 190 A.2d 781 (1963) (plaintiffs, passengers in automobile involved in intersectional collision, not bound by their testimony that their host driver had the green light when adverse operator testified that host had the red light); *Safeway Trails Inc. v. Smith,* 222 Md. 206, 214, 159 A.2d 823, 827–28 (1960) (answers of adverse party to interrogatories, when admitted in evidence, became substantive evidence but were not conclusive admissions of fact); 2 *McCormick on Evidence* § 258, at 153 (J.W. Strong 4th ed.1992).

Here there was direct and undisputed evidence that Sachs resigned as Bank president, that the physical location of his

office was being moved out of the Bank's quarters, and that a new president of the Bank was being hired. The jury reasonably could conclude that the new president would have managerial duties at the Bank and that the situation had changed, at least with respect to Sachs's ability to have NSF checks honored until covered.

■ Based on all of the factors reviewed above there are conflicting inferences as to the materiality of the overdrafts that occurred during the period of Sachs's employment as Bank president to the performance of his duties under the consulting contract with Regal. The record to date in this case can support a finding that Sachs would not be in a position, during the two-year term of the consulting contract, to cause overdrafts to be paid without assessment of whatever fees others would pay under similar circumstances because Bank operations at that time would be under the management of a much more meticulous banker.[6]

## VI

Nothing in this opinion prevents the petitioners from prevailing in whole or in part at trial by establishing that the overdrafts or other alleged misconduct by Sachs were, indeed,

---

**6.** The petitioners also rely on 12 C.F.R. § 563.39(b)(1) (1993) dealing with employment contracts by federal savings associations. It reads as follows:

"Each employment contract shall provide that:

"(1) The association's board of directors may terminate the officer or employee's employment at any time, but any termination by the association's board of directors other than termination for cause, shall not prejudice the officer or employee's right to compensation or other benefits under the contract. The officer or employee shall have no right to receive compensation or other benefits for any period after termination for cause. Termination for cause shall include termination because of the officer or employee's personal dishonesty, incompetence, willful misconduct, breach of fiduciary duty involving personal profit, intentional failure to perform stated duties, willful violation of any law, rule, or regulation (other than traffic violations or similar offenses) or final cease-and-desist order, or material breach of any provision of the contract."

This subsection is a restatement of the material breach/just cause principle which we have applied above.

material to his new position as a consultant, or that he would, in fact, be in a position to continue with those practices. Nor does this opinion preclude petitioners from claiming the value of any benefits that Sachs may have received in violation of a bank policy that was in effect and being applied at the time of Sachs's receipt of the benefit. It may also be that, if the board was surprised by the auditors' report of overdrafts, Sachs was thereby rendered ineffective, for one or more reasons, to serve as a consultant. But these are matters of fact to be developed at trial. The present record, which includes Sachs's description of the Bank's environment as laissez-faire so long as money was being made, prevents concluding that the evidence relating to the overdrafts constitutes, as a matter of law, just cause for terminating the consulting contract.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS, REGAL SAVINGS BANK, FSB AND REGAL BANCORP, INC.**