**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

<table>
<tr>
<td>

THOMAS W. GRESHAM,
<br>                    *Plaintiff-Appellant,*

v.

LUMBERMEN'S MUTUAL CASUALTY
COMPANY,

<br>                    *Defendant-Appellee.*
</td>
<td>No. 04-1868</td>
</tr>
</table>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-03-2243-01-JFM)

Argued: February 2, 2005

Decided: April 13, 2005

Before WILKINS, Chief Judge, WIDENER, Circuit Judge,
and Robert E. PAYNE, United States District Judge for the
Eastern District of Virginia, sitting by designation.

---

Reversed and remanded by published opinion. Chief Judge Wilkins
wrote the opinion, in which Judge Widener and Judge Payne joined.

---

## COUNSEL

**ARGUED:** Francis Joseph Collins, KAHN, SMITH & COLLINS,
P.A., Baltimore, Maryland, for Appellant. Jessica Regan Hughes,
SEYFARTH SHAW, Washington, D.C., for Appellee. **ON BRIEF:**
Thomas J. Piskorski, SEYFARTH SHAW, Chicago, Illinois, for
Appellee.

**OPINION**

WILKINS, Chief Judge:

Thomas W. Gresham appeals an order of the district court granting summary judgment to Kemper Casualty Company (Kemper)[1] on Gresham's claims for breach of contract and violation of the Maryland Wage Payment and Collection Law, *see* Md. Code Ann., Lab. & Empl. § 3-507.1 (1999). For the reasons set forth below, we reverse and remand for further proceedings.

I.

The facts are undisputed. In late 1998, Kemper hired several people to develop a line of professional liability insurance. On December 18 of that year, Gresham accepted a written offer of employment as a vice president in this division. In particular, Gresham was tasked with developing a liability insurance program for architects and engineers. The offer letter provided, in relevant part:

> Your compensation package will consist of:
>
> . . . .
>
> • Severance Protection — One year base salary will be paid if terminated without cause.

J.A. 7. Although Kemper makes available a benefit plan that includes severance pay (the Severance Plan), Gresham's offer letter neither referred to nor explicitly incorporated the Severance Plan. Under the Severance Plan, severance pay is based on the departing employee's length of employment; the parties agree that under the terms of the Severance Plan, Gresham would have been entitled to severance pay equivalent to only four weeks' salary. Additionally, the Severance Plan denies severance pay to an employee who is offered employment by a purchasing company.

---

[1]Kemper is a subsidiary of Lumbermen's Mutual Casualty Company, the named defendant in this action.

In January 2003, Kemper decided to shut down its professional liability division by putting outstanding policies into "runoff," *i.e.*, not renewing the policies when they reached the end of their terms. The runoff process can take up to three years. In March or April 2003, Kemper paid Gresham a "stay-on" bonus in exchange for his agreement to remain with the company while it sought a buyer for its professional liability division. On May 1, 2003, Kemper provided Gresham with a written, 60-day notice of termination.[2] Gresham was thus notified of a June 29 layoff. The materials provided to Gresham with the notice included a document entitled "Separation from Employment," which discussed the Severance Plan.

Approximately one week after Gresham received the termination notice, Kemper completed an asset transfer agreement with The St. Paul Insurance Companies (St. Paul). As part of the agreement, St. Paul agreed to offer employment to Gresham and five other executive employees in the professional liability division, and Kemper agreed to encourage these employees to accept the offers. Although this agreement was made while Gresham was still employed by Kemper, he did not learn of its existence until the discovery phase of this litigation.

St. Paul subsequently extended an offer of employment to Gresham. After receiving the offer, Gresham negotiated a "sign-on" bonus of $60,000 and a severance pay clause. Thereafter, he accepted the offer as modified.

Gresham never submitted a letter of resignation to Kemper or informed anyone at Kemper that he had accepted an offer from St. Paul. It appears, rather, that the date of Gresham's transfer from Kemper's payroll to St. Paul's was negotiated between the two companies without Gresham's involvement. As far as Gresham was concerned, there was no change—he continued performing the same functions at the same office, but with a different title and for a different employer.

[2]Kemper describes this document as "notice of a possible termination." Br. of Def.-Appellee Lumbermen's Mut. Cas. Co. at 9. There is no dispute, however, that possible became actual when Kemper completed the asset transfer agreement with St. Paul, as described in the text.

When Gresham sought payment of the severance benefit, Kemper denied it on the basis of Gresham's "continued employment." J.A. 34. Gresham subsequently filed this action claiming breach of contract and violation of the Maryland Wage Payment and Collection Law, *see* Md. Code Ann., Lab. & Empl. § 3-507.1. A third count alleged an alternative claim for violation of the Employee Retirement Income Security Act of 1974 (ERISA), *see* 29 U.S.C.A. § 1132(a)(1)(B) (West 1999), in the event the district court determined that the employment agreement between Gresham and Kemper constituted an "employee welfare benefit plan" within the meaning of ERISA, *see* 29 U.S.C.A. § 1002(1) (West 1999). Following discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment to Kemper, reasoning that Kemper had terminated Gresham "for cause" under the terms of his employment agreement because "a corporate executive cannot be simultaneously performing effective services to two different companies at the same time." J.A. 213. Having reached this conclusion, the district court declined to consider Kemper's claim that the severance benefit identified in Gresham's employment agreement was subject to the provisions of Kemper's Severance Plan or its assertion that Gresham's state law claims were preempted by ERISA.

## II.

We first consider whether Gresham's breach of contract and wage payment claims are preempted by ERISA. ERISA is a "comprehensive" and "closely integrated regulatory system" that is "designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (internal quotation marks omitted). Accomplishment of the objectives of ERISA is facilitated by its preemption clause, 29 U.S.C.A. § 1144(a) (West 1999), which protects the administrators of employee benefit plans from "the threat of conflicting and inconsistent State and local regulation," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 99 (1983) (internal quotation marks omitted); *see Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981) (noting that by enacting ERISA, Congress "meant to establish pension plan regulation as exclusively a federal concern").

Section 1144(a) provides, in relevant part, that the provisions of ERISA "shall supersede any and all State laws insofar as they . . .

relate to any employee benefit plan." The term "State law" encompasses not only statutes but also common law causes of action, such as Gresham's claim for breach of contract. *See* 29 U.S.C.A. § 1144(c)(1) (West 1999) ("The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law . . . ."). Thus, if Gresham's claim "relate[s] to" the Severance Plan, as Kemper contends, it is preempted by ERISA.

Under § 1144(a), "[a] law 'relates to' an employee benefit plan . . . if it has a connection with or reference to such a plan." *Shaw*, 463 U.S. at 96-97. While the scope of preemption is thus quite broad, it is not unlimited. *See Ingersoll-Rand*, 498 U.S. at 139. "What triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146-147 (2d Cir. 1989). Generally, when a state law claim may fairly be viewed as an alternative means of recovering benefits allegedly due under ERISA, there will be preemption. *See Aetna Health Inc. v. Davila*, 124 S. Ct. 2488, 2495 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."); *Monarch Cement Co. v. Lone Star Indus.*, 982 F.2d 1448, 1452 (10th Cir. 1992).

We addressed the scope of ERISA preemption with respect to a breach of contract claim in *Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473 (4th Cir. 1996) (en banc). James Stiltner accepted a written offer of employment from Beretta that included the following language related to Beretta's long-term disability plan:

> Long Term Disability: Pays 60% of salary after six months of disability (after one year of employment). Payable to age 70.

*Stiltner*, 74 F.3d at 1476 (internal quotation marks omitted). As a Beretta employee, Stiltner enrolled in Beretta's long-term disability plan, which provided coverage under essentially the same terms as those described in the offer of employment. The plan, however,

included a pre-existing condition limitation. When Stiltner subsequently became disabled due to a heart condition, the plan denied benefits on the basis that the condition was pre-existing. Stiltner sued, alleging, *inter alia*, that the offer letter was a contract that obligated Beretta to pay disability benefits independent of the disability plan. *See id.* at 1477, 1479. Although we did not reach a holding regarding preemption, we stated that the breach of contract claim was "very likely" preempted by ERISA "because it [sought] to recover benefits *of a sort which are already provided by an ERISA plan*, even though it [sought] to recover them not from the plan itself, but from the employer directly." *Id.* at 1480 (emphasis added); *see Kress v. Food Employers Labor Relations Ass'n*, 217 F. Supp. 2d 682, 686 (D. Md. 2002) (holding that the plaintiff's claim for breach of contract to provide benefits independent of ERISA plan was preempted because claim was "for the same *type* of benefits that the . . . ERISA-governed plan offered" (emphasis added)).

The dictum in *Stiltner* notwithstanding, we conclude that there is no preemption here.[3] First, the substantial differences between the severance provision of Gresham's employment agreement and the terms of the Severance Plan—most notably the significantly greater amount of the benefit promised to Gresham and the absence of any conditions other than termination without cause—make clear that Kemper's promise to pay Gresham severance operated independently of the Severance Plan. *See Crews v. Gen. Am. Life Ins. Co.*, 274 F.3d 502, 505 (8th Cir. 2001) (holding that contractual obligation to pay severance was independent of ERISA plan, and thus a breach of contract claim was not preempted, in light of higher amount to be paid and absence of any discretion).[4] Second, there is no indication in the

---

[3]Although we discuss only the breach of contract claim in the text, our reasoning applies equally to the claim under the Wage Payment and Collection Law, because that claim is based on the terms of Gresham's employment agreement.

[4]Kemper relies on *Welles v. Brach & Brock Confections, Inc.*, 14 Fed. Appx. 668 (7th Cir. 2001), an unpublished decision of the Seventh Circuit. Welles brought a breach of contract claim for severance benefits identified in a written offer of employment. The *Welles* panel held that the claim was preempted by ERISA because the offer letter (1) expressly stated that it was merely summarizing Welles' benefits, (2) precisely

record that severance pay awarded to Gresham pursuant to his employment agreement would be paid out of funds allocated to the Severance Plan. In light of these facts, it is evident that Gresham's breach of contract claim does not relate to the Severance Plan. We therefore hold that the claim is not preempted.[5]

### III.

We now turn to the question of whether the district court properly granted summary judgment to Kemper. We review the grant of summary judgment de novo. *See Edelman v. Lynchburg College*, 300 F.3d 400, 404 (4th Cir. 2002). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Gresham's breach of contract claim is governed by Maryland law. Under Maryland law, "[t]he interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 544 (Md. 2003). The purpose of contract interpretation is

---

tracked the severance benefits provided by the relevant ERISA plan, and (3) referred Welles to the Human Resources Department for additional information. *See Welles*, 14 Fed. Appx. at 671. *Welles* is easily distinguished from this case. First, Kemper's employment offer to Gresham nowhere stated that it was only summarizing Gresham's compensation package generally or the severance benefit in particular. And, the language of the severance provision does not track the terms of the Severance Plan.

[5]We note additionally that a holding that a breach of contract claim is preempted by ERISA whenever the plaintiff claims an independent promise to pay benefits of the same type as benefits also provided by an ERISA-governed plan would limit employers' ability to lure desirable employees by offering benefits better than those available to the rank-and-file. Indeed, although this fact is immaterial to our analysis, Gresham asserts that he would not have accepted employment with Kemper had his severance benefits been limited to those provided in the Severance Plan.

to determine and effectuate the intent of the parties, and the primary source for identifying this intent is the language of the contract itself. *See Turner v. Turner*, 809 A.2d 18, 49 (Md. Ct. Spec. App. 2002). Contracts are interpreted "as a whole," and "the terms of the agreement are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words." *Id.* (internal quotation marks omitted).

Under the Maryland rule of objective contract interpretation, a court must "give effect to the contract's plain meaning, without regard to what the parties to the contract thought it meant or intended it to mean." *Id.* (internal quotation marks & alteration omitted). The test for the meaning of an unambiguous contract is "what a reasonable person in the position of the parties would have thought the contract meant." *Id.* (internal quotation marks omitted). Other evidence of the parties' intent is relevant only if the contract is ambiguous. *See Sy-Lene of Wash.*, 829 A.2d at 544.

### A.   *The Severance Provision Is Not Ambiguous*

The severance provision stated, "One year base salary will be paid if terminated without cause." J.A. 7. This language is facially unambiguous. Kemper maintains, however, that the severance provision is ambiguous because it does not define cause. Therefore, Kemper asserts, other evidence of the parties' intent—specifically, the terms of the Severance Plan—are relevant. Since the Severance Plan excludes coverage when an employee accepts a position with a purchasing company, Kemper maintains that Gresham is not entitled to severance pay.

Kemper's argument fails because the term "cause" has an accepted meaning under Maryland common law, and it therefore is not ambiguous. Maryland common law defines cause for termination of employment as a material breach of the terms of the employment agreement. *See Towson Univ. v. Conte*, 862 A.2d 941, 956 (Md. 2004). A breach is material "if it affects the purpose of the contract in an important or vital way." *Sachs v. Regal Sav. Bank, FSB*, 705 A.2d 1, 4 (Md. Ct. Spec. App. 1998).

It is true that what constitutes a "material breach" of an employment contract is not subject to "a mathematically precise definition"

but rather "varies with the nature of the particular employment." *Shapiro v. Massengill*, 661 A.2d 202, 211 (Md. Ct. Spec. App. 1995). This does not mean that the term "cause" is ambiguous, however; it simply means that whether cause existed for termination is usually a factual question for the jury. *See Sachs*, 705 A.2d at 7 (concluding that whether breach of employment contract was material was a question of fact to be resolved at trial). For the reasons set forth in Part III.C., however, as a matter of law there was no cause here to terminate Gresham.

## B.   *The Employment Agreement Does Not Incorporate the Severance Plan*

Kemper also contends that the employment agreement, by its terms, incorporated the Severance Plan. Kemper notes that the employment agreement references several of Kemper's ERISA plans, including a pension plan, a supplemental retirement plan, and a profit-sharing plan. While the employment agreement does not mention the Severance Plan, Kemper maintains that the agreement nevertheless incorporates all of its ERISA plans, including the Severance Plan. *See Wells v. Chevy Chase Bank, FSB*, 832 A.2d 812, 831 (Md. 2003) ("Maryland law recognizes that parties may agree to define their rights and obligations by reference to documents or rules external to the contract."), *cert. denied*, 124 S. Ct. 1875 (2004). We disagree.

First, the agreement states that Gresham's "compensation package will consist of" various items including "Severance Protection — One year base salary will be paid if terminated without cause." J.A. 7. This language simply does not indicate that the severance component is incomplete without reference to other documents. In contrast, the salary component explicitly references a "salary program" and thus indicates that other materials may be necessary to understand the terms of that component. *See id.* ("$110,000 base salary. Our salary program is one that emphasizes salary increases based on merit . . . ."). Second, nothing in the remainder of the employment agreement indicates that the Severance Plan even exists, much less that its terms govern the payment of severance under Gresham's employment agreement. Finally, to the extent it is unclear whether the employment agreement incorporates the Severance Plan by reference, this uncer-

tainty should be resolved against Kemper, the drafter of the agreement. *See King v. Bankerd*, 492 A.2d 608, 612 (Md. 1985).

### C.  *Gresham Was Not Terminated for Cause*

The district court held that Kemper had cause to terminate Gresham because Gresham accepted employment with St. Paul, thus rendering his services unavailable to Kemper. Gresham responds that his transfer from Kemper to St. Paul was made entirely at Kemper's instigation and would not have occurred but for Kemper's sale of the professional liability division. Gresham contends that because his termination was not due to any malfeasance on his part, there was no cause for it and he is entitled to severance benefits.

Gresham relies on *Dahl v. Brunswick Corp.*, 356 A.2d 221 (Md. 1976). The plaintiffs in *Dahl* were employees of Brunswick Corporation; their employment contracts included an entitlement to severance pay if they were "involuntarily terminated," *i.e.*, terminated "for actions not within the direct control of the employee when no other suitable opening [with Brunswick] is available." *Id.* at 225 (internal quotation marks omitted). The court concluded, as Brunswick had conceded, that the plaintiffs had satisfied the plain terms of the severance clause, stating:

> Although there is a dearth of Maryland authority on point, there is ample support elsewhere for the position that when part or all of a company is sold and the employees are told that they cannot remain with their old employer, their employment has been terminated even though they immediately begin to work for the new owner.

*Id.* Having concluded that the plaintiffs had a contractual entitlement to severance pay, the court went on to consider and reject Brunswick's various defenses, including whether a novation had occurred. *See id.* at 227-31.

The district court offered two bases for distinguishing *Dahl*, neither of which is persuasive. First, the district court noted that the phrase "other suitable employment" does not appear in Gresham's employ-

ment agreement and that Kemper does not claim a novation. However, the consideration of these issues by the *Dahl* court was not relevant to, and did not affect, its ruling that the sale of a company effects a discharge of its employees even if they continue to be employed by the purchaser. Second, the district court noted that the purchasing company in *Dahl* became insolvent after the purchase, while "Gresham accepted employment with a[n] insurance company whose financial stability he does not question and that is paying him at least as well as Kemper had been paying him." J.A. 214. However, the financial stability of St. Paul is irrelevant to Kemper's contractual obligations. Likewise, the terms of Gresham's employment with St. Paul are irrelevant to the question of whether he was terminated by Kemper.

As the *Dahl* court noted, other courts have uniformly concluded that a company terminates its employees when it sells the portion of the business that employs them, even if the employees immediately begin work for the purchasing company. *See, e.g.*, *Gaydos v. White Motor Corp.*, 220 N.W.2d 697, 701 (Mich. Ct. App. 1974); *Chapin v. Fairchild Camera & Instr. Corp.*, 107 Cal. Rptr. 111, 115-17 (Cal. Ct. App. 1973); *Willets v. Emhart Mfg. Co.*, 208 A.2d 546, 548 (Conn. 1965); *Matthews v. Minn. Tribune Co.*, 10 N.W.2d 230, 232 (Minn. 1943). These courts have noted that when an employer sells its business, it "ma[kes] certain that it [can] no longer fulfil its part of the employment relationship" and thereby is considered to have terminated the employees. *Willets*, 208 A.2d at 548; *accord Matthews*, 10 N.W.2d at 232. These courts have also rejected the notion that the employee's voluntary acceptance of a position with the purchasing company precludes the payment of severance:

> There is no merit to the claim that the termination of the plaintiffs' employment by the defendant was voluntary on their part. It is true that the acceptance by the plaintiffs of new positions with [the purchasing company] was voluntary. *We are not concerned with the new jobs but, rather with the old ones. That termination was entirely involuntary on the part of the plaintiffs.* The defendant sold its business, or that part of it in which the plaintiffs were engaged, and by its voluntary act made it wholly impossible for the plaintiffs to continue that employment.

*Willets*, 208 A.2d at 548 (emphasis added); *accord Chapin*, 107 Cal. Rptr. at 116 ("The termination was entirely involuntary on the part of the Employees. Fairchild sold Memory Products . . . and by its voluntary act made it wholly impossible for the Employees to continue their employment with Fairchild.").

The cases discussed in the above paragraph were cited with approval in *Dahl*, and the *Dahl* court adopted the same rule that these cases advocate. Under that rule, an employee is "terminated" for purposes of a severance agreement when his employer sells the business in which the employee works. *See Dahl*, 356 A.2d at 225. This is true notwithstanding that the employee may voluntarily accept employment with the purchasing company. The salient point is that the employer, not the employee, has ended the employment relationship by selling the business.

Under this rule, the district court erred in granting summary judgment to Kemper. Kemper sold its professional liability business to St. Paul, thereby making itself unable to fulfill its part of the employment agreement with Gresham. That Gresham voluntarily accepted a position with St. Paul does not alter the fact that Kemper, by its sale of the professional liability line, made it impossible for Gresham to continue his employment.[6]

IV.

For the reasons set forth above, we reverse the grant of summary

---

[6]We also reverse the grant of summary judgment on Gresham's claim under the Maryland Wage Payment and Collection Law. That Act authorizes an award of treble damages to an employee if an employer withholds payment of a wage in violation of the Act, unless the failure to pay is "a result of a bona fide dispute." Md. Code Ann. § 3-507.1(b). We leave it to the district court to address in the first instance Kemper's claim that severance pay is not "wages" within the meaning of the Act. *But cf. Stevenson v. Branch Banking & Trust Corp.*, 861 A.2d 735, 749 (Md. Ct. Spec. App. 2004) ("Given the broad language of the statute and its remedial purpose, we conclude that the scope of Maryland's Wage Payment Act extends to the type of severance pay that represents deferred compensation for work performed during the employment.").

judgment to Kemper and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*