# IN THE SUPREME COURT OF TEXAS

════════════

NO. 12-0360

════════════

ARSENIO COLORADO, ET AL., PETITIONERS,

v.

TYCO VALVES & CONTROLS, L.P. AND TV&C GP HOLDINGS, INC.,
RESPONDENTS

═══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

═══════════════════════════════════════════════

**Argued September 11, 2013**

JUSTICE LEHRMANN delivered the opinion of the Court.

After deciding to close one of its facilities, Tyco Valves & Controls, L.P. (Tyco) offered certain skilled employees retention agreements to encourage them to remain with the company through the facility's closure. These agreements provided that, in consideration for remaining employed during the retention period, the employees would receive (1) a cash bonus, and (2) severance payments in the event they were not offered comparable employment with Tyco. Eventually, Tyco sold one of the production units located in the facility to another company. Seventeen former Tyco employees who had worked in that unit and been denied severance sued Tyco for breach of contract. Eleven of those employees alleged that they were entitled to severance payments under the retention agreements, notwithstanding the fact that the purchasing company had

offered them comparable employment commencing immediately upon the employees' termination by Tyco. The other six employees, who had not executed retention agreements, alleged that they were entitled to severance payments under oral agreements with Tyco. After a bench trial, the trial court found for the employees, awarding them severance pay. The court of appeals reversed in a divided opinion and rendered judgment for Tyco. 365 S.W.3d 750.

Three issues are presented for our review. First, we determine whether the employees' breach-of-contract claims are preempted by the Employee Retirement Income and Security Act of 1974 (ERISA).[1] If the claims are not preempted, we must also consider whether legally sufficient evidence exists to prove that (1) Tyco breached the retention agreements by failing to pay severance in light of the purchasing company's offers of comparable employment, and (2) oral agreements to pay severance existed between Tyco and the employees who did not have written agreements. We hold that ERISA preempts the employees' breach-of-contract claims and thus need not reach the remaining issues. Accordingly, we affirm the court of appeals' judgment.

## I. Factual and Procedural Background

The plaintiffs in this action (Gimpel Employees) worked in Tyco's Gimpel Unit, which manufactured specialized valves. Along with various other Tyco production units, the Gimpel Unit was located in Tyco's West Gulf Bank facility in Houston. By the summer of 2006, Tyco planned to close the West Gulf Bank facility and relocate the units housed there. At that time, the Gimpel Employees were covered by Tyco's Severance Plan for U.S. Employees (ERISA Plan), which was undisputedly governed by ERISA and which provided for eligible employees to receive certain

---

[1] ERISA is codified in Title 29 of the United States Code. *See* 29 U.S.C. §§ 1001–1461.

severance benefits in the event they were terminated for reasons other than cause. The ERISA Plan excluded from eligibility employees who were terminated as the result of a sale of Tyco's assets and had the opportunity to continue employment with the purchaser. The benefits schedule under the Plan included one week's severance pay for each year of the employee's service, subject to a minimum of two weeks and a maximum of fifty-two weeks (referred to as a "2-and-52" schedule).

In August 2006, while plans for closing the West Gulf Bank facility were underway, Tyco's new human resources director, Holly Kriendler, created a one-page document entitled "Tyco Valves and Controls Severance" that outlined a severance schedule for that facility. Pursuant to this schedule (West Gulf Bank Schedule), eligible hourly employees would receive one week's severance pay for each year of service and eligible salaried employees would receive two weeks' severance pay for each year of service, subject to a minimum of six weeks and a maximum of twenty-six weeks (referred to as a "6-and-26" schedule). In addition to this 6-and-26 schedule, the West Gulf Bank Schedule contained several provisions copied directly from the ERISA Plan, utilizing capitalized terms that were defined only in the ERISA Plan.[2] It also stated: "This policy shall apply to bands 4 – 7 and supersede any prior plan, program or policy under which the Company provided severance benefits prior to the Effective Date of the Policy."[3]

In late 2006, Tyco informed the Gimpel Employees of its intention to sell, rather than relocate, the Gimpel Unit. In order to retain its skilled labor force and facilitate the sale, Tyco

---

[2] For example, the West Gulf Bank Schedule uses terms like "Severance Benefit," "Participant," and "Committee."

[3] Tyco classified its employees in "bands" depending on their position. The Gimpel Employees were all classified within bands four through seven.

offered a Retention Incentive Agreement (RIA) to eleven of the Gimpel Employees (RIA Employees).[4] Each RIA, dated between January 5 and January 15, 2007, was made "by and between Tyco Valves and Controls, its successors and assigns ('Tyco' or 'Company'), and [the respective RIA Employee]."[5] The RIAs provided for the payment of a "retention incentive bonus" if the employees remained with Tyco through a specified period, stating in relevant part:

> (a) **Stay Incentive Bonus.** If the Employee has remained an Active Employee of Tyco for the entire Retention Period . . . then, as soon as practical following the end of the Retention Period, Tyco will pay the Employee a retention incentive bonus (a "Retention Bonus") consisting of either:
>
>> (i) in the event that the Employee is not offered Comparable Employment with Tyco, an amount equal to [between $2,500 and $10,000, depending on the Employee] (Retention Bonus) plus the standard Severance in accordance to [sic] the severance schedule associated with the closure of this facility. . . . [or]
>>
>> (ii) in the event that the Employee is offered Comparable Employment with Tyco, a cash payment of [between $2,500 and $10,000] subject to the Employee's acceptable performance during the Retention Period.

The RIAs defined "Comparable Employment" to mean that "within 30 days after the end of the Retention Period, the Employee is offered employment with the Company of comparable pay, status and skill level at a location that is within 25 miles of Employees [sic] current work location."

In meetings with the West Gulf Bank facility's acting human-resources manager, conducted either when the RIAs were executed or shortly thereafter, the RIA Employees were orally assured that they would receive severance if the Gimpel Unit were sold. After discussions among

---

[4] The RIA Employees are Petitioners Steven Craig, Umit Davulcu, Richard Gonzales, Lanny Heinrich, Leonard Hill, Chris Kahrig, Lay Keonakhone, Tung Le, Raul Martinez, Kenneth Nash, and Jimmy Phoumlavanh.

[5] Beginning in August 2006, Tyco also entered into substantially identical RIAs with employees of other units located at the West Gulf Bank facility. Those employees are not part of the underlying suit.

management that "confusion" existed with respect to employee communications about severance, the Gimpel Employees were told that they would not be entitled to severance if they were offered a job by the purchaser of the Gimpel Unit. None of the RIA Employees who testified at trial had heard of the ERISA Plan when they signed the RIAs.

On February 27, 2007, Tyco formally amended the ERISA Plan with an effective date relating back to December 1, 2006. Under the amended ERISA Plan, the severance schedule for the West Gulf Bank facility mirrored the 6-and-26 schedule set out in the West Gulf Bank Schedule; the amended Plan did not change the provision relating to employees who were terminated as a result of an asset sale. According to internal e-mails and Kriendler's testimony at trial, at the time the ERISA Plan was formally amended Tyco was already utilizing the 6-and-26 schedule for West Gulf Bank employees who had been terminated in connection with the facility's closure. Kriendler explained that she had believed flexibility existed in the ERISA Plan's severance schedule as it applied to non-executive employees. Thus, although the 6-and-26 schedule had been approved by the company's financial group, Kriendler "didn't realize that there was a separate administrative approval that needed to be done through the plan administrator" to properly utilize a schedule of benefits that differed from the schedule laid out in the ERISA Plan. As noted above, that administrative-approval process was completed on February 27, 2007, with an effective date of December 1, 2006.

In the spring of 2007, Tyco agreed to sell the Gimpel Unit to Dresser-Rand Company. The asset purchase agreement between Dresser-Rand and Tyco required Dresser-Rand to hire all the Gimpel Employees at substantially the same pay rate and seniority level with respect to accrual of

5

and eligibility for non-pension retirement benefits, severance, and vacation. However, Tyco expressly reserved liability for "wages, salary, severance, [and] bonuses," as well as "any duties, obligations or liabilities arising under any employee benefit plan" and any other amounts owed to the Gimpel Employees as of the closing date.

In accordance with the purchase agreement, Dresser-Rand offered all the Gimpel Employees employment in effectively identical positions, with largely identical pay, benefits, and seniority. The Gimpel Employees commenced working for Dresser-Rand immediately following their termination by Tyco. The Gimpel Unit was moved to a Dresser-Rand facility fewer than twenty-five miles away from the West Gulf Bank facility.

Tyco timely paid the lump-sum cash bonuses to the RIA Employees under the terms of the RIAs, but refused to pay severance to any of the Gimpel Employees because of Dresser-Rand's employment offers. The Gimpel Employees sued Tyco[6] for breach of contract, alleging that they were entitled to severance upon the sale of the Gimpel Unit and their termination by Tyco. Six Gimpel Employees who had not executed RIAs (non-RIA Employees) claimed that Tyco had breached oral agreements to pay them severance on the same terms as the RIA Employees.[7] The Gimpel Employees collectively alleged that they were not offered comparable employment with Tyco upon the sale of the Gimpel Unit and were therefore entitled to severance despite having obtained comparable positions with Dresser-Rand. Tyco denied entering into oral agreements with

---

[6] Tyco's general partner, TV&C GP Holdings, Inc., is also a defendant.

[7] The non-RIA Employees are Arsenio Colorado, Andy Huynh, Chris Luckey, Fernando Macias, Jorge Martinez, and Souk Vongsamphanh.

the non-RIA Employees and denied breaching the RIAs, contending that the RIA Employees were not entitled to severance because they were offered comparable employment with a Tyco successor. Shortly before trial, Tyco pled as an affirmative defense that the Gimpel Employees' claims were preempted by ERISA.

After a bench trial, the trial court rendered judgment for the Gimpel Employees. In its findings of fact and conclusions of law, the trial court found that the Gimpel Employees' contract claims were not preempted by ERISA, as the agreements between Tyco and the Gimpel Employees were "not connected to, dependent on, or related to the Tyco Severance Plan" and were "independent contracts with terms and conditions that [were] different from the Tyco Severance Plan." The trial court also held that Dresser-Rand was not a "successor or assign" of Tyco and that Tyco therefore breached the RIAs by refusing to pay severance to the RIA Employees. With regard to the non-RIA Employees, the trial court found that Tyco had made oral promises to pay them severance under the West Gulf Bank Schedule and that those promises constituted binding unilateral contracts that became irrevocable upon the employees' performance by remaining with Tyco through the sale to Dresser-Rand.

The court of appeals reversed in a divided opinion. A majority held that ERISA did not preempt the breach-of-contract claims and that no evidence demonstrated an oral agreement between Tyco and the non-RIA Employees. 365 S.W.3d at 770–71. As to the RIA Employees, the two justices who reached the issue were split as to whether the RIA Employees were offered comparable employment with a "successor" of Tyco and, in turn, whether Tyco breached the RIAs. *Id.* at 774; *see also id.* at 779–80 (Sharp, J., dissenting in part). One justice would have held that the claims

7

were preempted by ERISA and thus concurred in the court's take-nothing judgment for Tyco. *Id.* at 777 (Massengale, J., concurring). We granted the Gimpel Employees' petition for review.

## II. ERISA Preemption of State-Law Claims

We first address whether ERISA preempts the Gimpel Employees' breach-of-contract claims. As applied to this case, ERISA preemption is an affirmative defense on which Tyco bore the burden of proof at trial. *See Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex. 1991) (holding that ERISA preemption is an affirmative defense "where ERISA's preemptive effect would result only in a change of the applicable law" and would not subject the claim to exclusive federal jurisdiction); 29 U.S.C. § 1132(a)(1)(B), (e)(1) (giving state and federal courts concurrent jurisdiction over actions by a beneficiary to recover benefits due under the terms of a covered plan or to enforce rights under the plan). Accordingly, we will disturb the trial court's finding against Tyco on this issue only if the Gimpel Employees' claims were preempted as a matter of law. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

ERISA is a comprehensive scheme enacted to promote employees' interests in their benefit plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983); *Cathey v. Metro. Life Ins. Co.*, 805 S.W.2d 387, 388 (Tex. 1991). The statute establishes various pension-plan requirements and mandates uniform standards for both pension and welfare-benefit plans. *Shaw*, 463 U.S. at 91. ERISA does not itself mandate any particular set of benefits, but rather sets standards governing reporting, disclosure, and fiduciary responsibility for ERISA-governed plans. *Id.*; *Cathey*, 805 S.W.2d at 388.

8

Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). ERISA's expansive preemption provisions are intended to ensure exclusive federal regulation of employee benefit plans. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Accordingly, ERISA's preemption provision has been broadly construed. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987) (citing *Shaw*, 463 U.S. at 96–97). State laws that are subject to preemption include not just statutes, but also common-law causes of action like the Gimpel Employees' breach-of-contract claims. *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 258 (4th Cir. 2005) (citing 29 U.S.C. § 1144(c)(1)). Thus, in resolving the preemption issue, we must decide whether those claims "relate to" Tyco's ERISA Plan, which itself undisputedly qualifies as an employee benefit plan governed by ERISA.

In *Shaw*, the United States Supreme Court construed the phrase "relates to" as carrying its ordinary meaning of having "a connection with or reference to" an employee benefit plan. 463 U.S. at 96–97. The Supreme Court noted, however, that if the state action affects a benefit plan "in too tenuous, remote, or peripheral a manner," the impermissible connection to ERISA does not exist. *Id.* at 100 n.21; *see also Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001) (looking to "the objectives of the ERISA statute" and "the nature of the effect of the state law on ERISA plans" in determining whether "the forbidden connection" exists) (citations and internal quotation marks omitted).

The Supreme Court further clarified the bounds of ERISA preemption in *Fort Halifax*, holding that a statutorily mandated one-time, lump-sum severance payment to employees upon a plant closure did not require an administrative scheme to administer, and as such did not constitute

9

an employee benefit plan generating the potential for conflicting regulation. 482 U.S. at 12. The Court reasoned that "Congress intended preemption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations[, but this] concern only arises . . . with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Id.* at 11; *see also Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 440–41 (5th Cir. 2006) (holding that the employer did not have a plan under ERISA where no administrative scheme was required to pay the annuity benefit).

Federal circuit cases addressing the preemption issue confirm that "ERISA . . . preempts state common law causes of action that reference or pertain to an ERISA plan." *Eide v. Grey Fox Technical Servs. Corp.*, 329 F.3d 600, 604 (8th Cir. 2003); *see also Epps v. NCNB Tex.*, 7 F.3d 44, 45 (5th Cir. 1993) ("When a court must refer to an ERISA plan to determine the plaintiff's retirement benefits and compute the damages claimed, the claim relates to an ERISA plan."). Further, if alleged promises made to employees "were simply an attempt to amend [an] existing plan, then it follows that they were based on that plan." *Crews v. Gen. Am. Life Ins. Co.*, 274 F.3d 502, 505 (8th Cir. 2001).

The trial court found that Tyco's promises to pay severance to the Gimpel Employees were independent agreements based on the West Gulf Bank Schedule terms, not Tyco's ERISA Plan. The court of appeals agreed, holding that the RIAs' provision for "standard Severance in accordance to the severance schedule associated with the closure of this facility" referred to the West Gulf Bank Schedule, 365 S.W.3d at 767, and that the West Gulf Bank Schedule "was not associated with or related to an ERISA Plan," *id.* at 769. The concurring justice in the court of appeals would have

10

held that, rather than creating an independent duty, the RIAs and the West Gulf Bank Schedule were merely impermissible amendments to the Tyco Severance Plan and were thus "related to" the Plan and preempted by ERISA. *Id.* at 776–78 (Massengale, J., concurring).

As an initial matter, and leaving aside the RIAs for the moment, we disagree with the trial court's and court of appeals' conclusion that the West Gulf Bank Schedule was not related to the ERISA Plan, as they rely on evidence that is not probative of the improper amendment issue and ignore conclusive evidence contradicting that conclusion. Those courts found persuasive the undisputed fact that the West Gulf Bank Schedule's 6-and-26 schedule was in use at the West Gulf Bank facility, and had been communicated to its employees, before the ERISA Plan's formal amendment.[8] By itself, however, this evidence is inconclusive. The express terms of the West Gulf Bank Schedule, the principal document on which the Gimpel Employees rely, provide that it "supersede[s] any prior plan, program or policy under which the Company provided severance benefits prior to the Effective Date of the Policy." And Tyco provided such benefits under its ERISA Plan. This is consistent with Tyco's internal e-mails and Kriendler's testimony that the 6-and-26 schedule was intended to replace the ERISA Plan's schedule of benefits as it applied to certain employees at the West Gulf Bank facility, and that confusion existed about the need to

---

[8] This is consistent with the trial court's finding that one portion of Kriendler's testimony—that she created the specific one-page document outlining the West Gulf Bank Schedule for her own use and did not intend for it to be distributed to employees—lacked credibility. Kriendler never denied, and in fact affirmatively testified, that by August 2006 Tyco intended the 6-and-26 schedule reflected in the West Gulf Bank Schedule to apply to the closure of the West Gulf Bank facility.

11

formally amend the ERISA Plan to effectuate that change.[9]  Based on this evidence, we can come to no other conclusion than that the West Gulf Bank Schedule was an attempt to amend Tyco's ERISA Plan and that the formal process of amending the ERISA Plan was completed in February 2007.[10]  As discussed below, this conclusion is dispositive of the preemption question presented.

Addressing the non-RIA Employees' claims first, we hold that they are preempted by ERISA.  The trial court found that Tyco agreed to pay severance to those employees by directly communicating the West Gulf Bank Schedule terms to the employees and posting the schedule on a facility bulletin board.  But promises to pay severance pursuant to the West Gulf Bank Schedule were simply promises to pay severance pursuant to an improperly amended ERISA Plan.  It follows, then, that such promises "were based on that plan."  *Crews*, 274 F.3d at 505.

While the RIA Employees' claims are a closer question, we similarly hold that they are preempted.  The RIAs, in order to give employees incentive to remain with Tyco through the closure of the West Gulf Bank facility, promised the employees (1) a one-time cash bonus, payable without further condition, and (2) "in the event that the Employee is not offered Comparable Employment with Tyco, . . . the standard Severance in accordance to [sic] the severance schedule associated with the closure of this facility."  Although the bonus provision, with which Tyco complied, is not at

---

[9] The trial court found that the West Gulf Bank Schedule had been created in connection with a prior restructuring.  Specifically, Kriendler testified that the 6-and-26 schedule was utilized with respect to a handful of employees who had been displaced when two other Tyco facilities were relocated.  We fail to see how this evidence is relevant to the question of whether the schedule was an improper attempt to amend the ERISA Plan with respect to the West Gulf Bank employees.

[10] The parties do not address, and we express no opinion on, the propriety under ERISA of making the amended Plan effective retroactively to December 1, 2006.

issue in this case, a comparison of that provision with the severance provision aids our conclusion that the latter is preempted.

The bonus provision does not refer to or rely on the ERISA Plan in any way, and is akin to the non-preempted statute in *Fort Halifax* mandating a one-time, lump-sum severance payment to employees for remaining employed through a plant closure. *Fort Halifax*, 482 U.S. at 12. By contrast, the severance provision may be analyzed only in conjunction with the "standard Severance." The trial court and court of appeals held that the "standard Severance" referenced in the RIAs was the West Gulf Bank Schedule and that these two documents could be analyzed independently of the ERISA Plan. But as discussed above, the West Gulf Bank Schedule was an improper attempt to amend the ERISA Plan's schedule of benefits, which was subsequently incorporated by formal amendment to the Plan. Accordingly, even if the "standard Severance" to which the RIAs refer is the severance benefit described in the West Gulf Bank Schedule, that Schedule itself relates to and is an improper attempt to amend the ERISA Plan. *See* 365 S.W.3d at 777 (Massengale, J., concurring).

In turn, any benefits must be calculated pursuant to the ERISA Plan, which, as amended, sets out the 6-and-26 schedule described above. *See Epps*, 7 F.3d at 45 (holding that an employee's claim for breach of a letter agreement was preempted by ERISA where the agreement "d[id] not specify the amount or other terms of [the employee's] retirement benefits, and the court would have to refer to the [employer's ERISA-governed retirement plan] to determine [the employee's] retirement benefits and calculate the damages claimed"). We thus agree with the concurring justice in the court of appeals that "[t]he contract claims at issue have the forbidden connection because the

13

RIAs reference and borrow terms from Tyco's [ERISA P]lan, yet they also purport to modify the eligibility parameters of the severance benefit provided under that plan."  365 S.W.3d at 777 (Massengale, J., concurring); *see also Crews*, 274 F.3d at 505 (where promises made to employees are "simply an attempt to amend [an] existing plan, then it follows that they were based on that plan").

The RIAs' reference to and reliance on the ERISA Plan is significant and distinguishes this case from those relied upon by the RIA Employees.  In *Crews*, for example, General American Life Insurance Company allegedly promised its employees a lump-sum severance payment in consideration for the employees' remaining with the company following the termination of its contract with the Health Care Financing Administration. 274 F.3d at 505–06.  General American did not mention the plan in promising to pay the "stay-on bonus," which was calculated differently from the benefit in the established plan.  *Id.* at 505.  Further, the bonus's purpose was unrelated to the plan's purpose of aiding terminated employees.  *Id.*

The stay-on bonus in *Crews* is akin to the cash-bonus provision in the RIAs.  Both specify a benefit in a particular amount that differs from the calculation under an established ERISA plan, and both are triggered solely by the employees' remaining with the company through a fixed date. By contrast, the RIAs' severance provision enumerates benefits that can only be calculated by reference to the West Gulf Bank Schedule, which in turn relates to the ERISA Plan.  Further, by promising the severance payment only in the event the employee is not offered "comparable employment," the severance provision goes beyond giving employees incentive to stay with the company and remains tied to protecting employees who suffer at least an adverse employment

14

action, if not a total loss of employment, through no fault of their own. The ERISA Plan serves a similar purpose of providing benefits to employees who are involuntarily terminated for reasons other than cause.

The RIA Employees also rely heavily on *Gresham*, in which the Fourth Circuit held that an employee's breach-of-contract claim based on a severance provision in a written employment offer was not preempted by ERISA because the agreement operated independently of the employer's established severance plan. 404 F.3d at 259. The facts of *Gresham* are similar in several ways to the facts at hand. As in this case, the established plan denied severance to an employee who was offered employment by a purchasing company, while the only condition on payment of severance in the employment agreement was termination without cause. *Id.* Further, the Fourth Circuit held that the employee was entitled to the severance benefit even though he had accepted employment with a purchasing company. *Id.* at 262–63.

However, significant differences also exist between the circumstances in *Gresham* and those at issue here that lead us to reach the opposite conclusion on preemption. First, the offer letter in *Gresham* did not mention the established plan and expressly set out a benefit calculation that differed from the plan's schedule. *Id.* at 256; *see also Santini v. Cytec Indus., Inc.*, 537 F. Supp. 2d 1230, 1245 (S.D. Ala. 2008) ("In the instant action, the agreement at issue does not promise to provide benefits under the Plan or refer to the Plan in any way. Plaintiff's employment contract agrees to provide a notice period and/or payments upon termination, calculated according to the terms stated in the employment contract."). Again, in this case, the RIAs referenced the West Gulf Bank Schedule, which related to the ERISA Plan, and benefits could not be calculated independently

15

of that Plan. Further, in *Gresham*, the Fourth Circuit found persuasive that there was "no indication in the record that severance pay awarded to Gresham pursuant to his employment agreement would be paid out of funds allocated to the Severance Plan." 404 F.3d at 259; *see also Eide*, 329 F.3d at 606 (noting that promised severance benefits in the event of termination by a purchasing company "were not to be delivered pursuant to [the severance plan]," but were to be distributed as a lump-sum payment upon termination). In this case, both the ERISA Plan and the West Gulf Bank Schedule provided that benefits "shall be paid in accordance with normal payroll practices over the Severance Period or from a supplemental unemployment benefits trust." All indications, therefore, are that any severance benefits owed to the employees under the RIAs would originate from the same source as any benefits owed under the ERISA Plan.

Based on the clear connection between the RIAs and the ERISA Plan, we cannot conclude that they operated independently. That said, we share the Fourth Circuit's concern, expressed in *Gresham*, that a finding of preemption "whenever the plaintiff claims an independent promise to pay benefits of the same type as benefits also provided by an ERISA-governed plan would limit employers' ability to lure desirable employees by offering benefits better than those available to the rank-and-file." 404 F.3d at 259 n.5. But our holding is not based on the fact that the RIAs' severance provision promises to pay benefits "of the same type" as benefits offered under the ERISA Plan. Rather, it is based on the fact that the employees' entitlement to benefits under the RIAs, and the damages claimed, could not be fully evaluated without considering the ERISA-governed plan that was expressly referenced in the RIAs. Further, the benefits originated from the same source. As discussed above, at best, the RIA Employees' claims stem from an improper attempt to amend

16

the ERISA Plan and are thus necessarily "based on" that plan.  *Crews*, 274 F.3d at 505.

Accordingly, we hold that the RIAs did not operate independently of the ERISA Plan.  The RIA

Employees' breach-of-contract claims are thus "related to" the ERISA Plan and are in turn

preempted by ERISA.

## IV. Conclusion

Because the Gimpel Employees' contract claims are preempted, we need not decide whether

legally sufficient evidence supports the trial court's findings as to those claims.[11]  Although we

disagree with the court of appeals' opinion on the preemption issue, we nevertheless agree with the

court's judgment that the Gimpel Employees take nothing by their breach-of-contract claims.

Accordingly, we affirm the court of appeals' judgment.

 

Debra H. Lehrmann
Justice

**OPINION DELIVERED:**  March 28, 2014

---

[11] The Gimpel Employees have never asserted that they prevail under ERISA in the event the claims are preempted.  At oral argument, counsel for the Gimpel Employees conceded that they could not successfully assert a claim for benefits under the ERISA Plan.  Thus, there is no basis on which to remand the case.

17